608 CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al. [JANUARY

## LYTLE ET AL. (CLOYES' HEIRS) vs. THE STATE ET AL.

[DETERMINED AT THE JANUARY TERM, 1857.]

The decision of the Supreme Court of the United States in this case (9 *How. Rep.* 314) is the "law of the case," in the ordinary legal sense of that phrase, in all matters decided in the case as then presented: but as to all matters arising in the subsequent progress of the cause—new facts and new parties having been brought upon the record, and new issues made—it will be considered as substantially new for all practical purposes, and be determined as well in reference to known equity law, as to the decision of the appellate court.

Where the payment, under a right of pre-emption, is made before the official plats of survey are filed in the Land Office of the district where the land is situated, though sanctioned by the Commissioner of the General Land Office under directions of the Secretary of the Treasury, it cannot be regarded as a legal payment for the land; but it may be taken as a tender persisted in.

It would seem unreasonable and improbable that Congress should have designed, by the pre-emption act of 29th May, 1830, as to unsurveyed land, that payment should have been tendered previous to the time when, by law, it might be received by the agents of the Government; and a tender made within the twelve months allowed by the act of 14th July, 1832, after the return of the plats of survey, held sufficient.

Where several tenants in common are infants, at the time their cause of action accrues, they have, respectively, the right to bring their action within the time specified in the 4th section of the act of limitation, (*Digest, chap.* 99,) after the removal of the disability: the disability of one of several co-plaintiffs operates neither to the advantage or disadvantage of the others.

The interest of the heirs of a pre-emptor, after proof, adjudication, payment and the issuance of the patent certificate, is a tenancy in common: and a joint action may be brought by all the heirs, and a recovery had by all, or a part of them only, where some of them are barred by the statute of limitations, and others not—being infants when the right of action accrued, and bringing their suit within the time limited by the act after the removal of the disability.

If an action of ejectment be brought by several tenants in common, it must be considered, under our statutory provisions, as on several demises; and if some be barred by the statute of limitations and others not, the latter may still recover their proportion.

The statute of limitations does not commence to run against a pre-emptor until payment of the money according to law, and the issuance of the patent certificate.

TERM 1857.] Lytle et al. (Cloyes' Heirs) vs. The State et al.

The filing of an amended bill, bringing new parties upon the record, will be regarded as the commencement of the suit as to such new parties, upon the defence of the statute of limitation; and not the filing of the bill.

If the statute of limitations commence running against an infant, entitled to bring an action for land, &c., and he die before arriving at age, the statute will be a complete bar against his heirs, though they be infants at the time, unless they bring their action within the time limited by the 5th section of chap. 99, Digest.

An attorney at law may purchase of his client an interest in the subject matter of the suit, in consideration of services rendered and to be rendered in the prosecution of the suit, and become bound for the costs in the prosecution of his own and client's rights, without the violation of any law of champerty in this State.

A sale and conveyance of land, pendente lite, in this State, is not void: the vendee in such case takes the interest conveyed, subject to every defence against his vendor, and holds it precisely as he held it, in every respect, as to other persons. (Merrick & Fenno vs. Hutt, 15 Ark. Rep. 344.)

[The above, by the Hon. C. C. SCOTT, Judge.]

Where a pre-emption claimant applies to a court of equity to enforce his pre-emption claim against parties in possession, claiming under a legal title, they may well set up the fraud of the complainants in establishing the pre-emption right, though their interest in the subject was acquired subsequent to the fraud.

On a bill filed by a pre-emption claimant, whose rights are resisted on the ground of fraud in establishing the pre-emption, the court will look to the finding of the Register and Receiver, not to determine whether there was sufficient evidence before them to authorize their finding, but whether their finding was not superinduced by fraud on the part of the pre-emption claimant.

Where the representations, made to the Register and Receiver by the person claiming the pre-emption, and sustained by his other witnesses, were clearly calculated to deceive them as to occupation and cultivation, a court of chancery may, with propriety, disregard the finding of the Register and Receiver, and consider the pre-emption right at large upon the allegations and proof; and in doing so, hold those seeking to set it up against rights fairly and openly obtained, to the onus probandi.

Where, upon the whole testimony, a court of chancery finds a claim to a pre-emption colorable, and fraudulent in law, and that it was found in favor of the claimant by the Register and Receiver upon false testimony, this court will not enforce it against the parties holding under a legal title subsequently acquired from the Government.

[By the Court.]

47c

*Appeal from the Chancery Court for Pulaski County.*

The Hon. HULBERT F. FAIRCHILD, Chancellor.

This cause was argued at great length, before the Hon. C. C. SCOTT and Hon. T. B. HANLY, Judges—the Hon. E. H. ENGLISH, Chief Justice, being disqualified—by Messrs. *Fowler & Stillwell*, for the appellants, and by Mr. *S. H. Hempstead* for the appellees, upon the testimony in relation to the alleged fraud, in proving the pre-emption right; the defence, made by some of the defendants, that they were purchasers without notice; and their claim to compensation for improvements: also by Messrs. *Watkins & Gallagher*, Messrs. *Cummins & Garland*, and Mr. *Bertrand* for the appellees.

FOWLER & STILLWELL, for the appellees.

The idea seemingly entertained by some of the counsel for the defence in this case, and also by the Chancellor, that the former decree in this case, by the Supreme Court of the United States, is *not " the law of the case "*—to govern it absolutely, as far as that decree went—because amendments and new parties were subsequently made, is, at least, a *novel* one.

The issue is substantially the same now, as presented before; and such changes as have been made only present the complainants' rights much more clearly and strongly, and render the former adjudication much more emphatically *" the law of the case,"* and more conclusive now, than it could possibly have been without such change. For instance, among other new facts of like nature, we now show a regular entry on the *tract-book* and on the *plats* in the Land Office, which was not shown before the former decision.

And the law, in all such cases, is well settled, and without an exception, that an adjudication of the Supreme Court of the

United States is conclusive *down to the very point decided*, and becomes *unchangeably* the "law of the case," and nothing behind that point can ever be opened or revived afterwards. See *Himely vs. Rose*, 2 *Cond. Rep.* 267; *Nelson et al. vs. Hubbard et al.*, 13 *Ark. Rep.* 256; *Fontenberry vs. Frazier*, 5 *Ib.* 202; *Story, Ex parte*, 12 *Pet. Rep.* 339; *Sibbald vs. The United States*, *Ib.* 492; *West vs. Brashear*, 14 *Pet. Rep.* 54; *Porter vs Hanly*, 10 *Ark. Rep.* 191; *Boyle vs. Grundy*, 9 *Pet. Rep.* 290; *Skillen vs. May*, 2 *Cond. Rep.* 367; *The Santa Maria*, 6 *Ib.* 178, 180; *Walker et al. vs. Walker*, 7 *Ark. Rep.* 556; *Pulaski County vs. Lincoln*, 13 *Ib.* 104; *Rector vs. Danley*, 14 *Ib.* 306; *Story vs. Livingston*, 13 *Pet. Rep.* 367.

In this case, then, what can be enquired into under that former decision, but the question of fraud, and purchase, *bona fide*, without notice? And by the well understood principles of equity, we think both of these must be determined against the defence.

As a general principle of law, it is well settled, that where the matter adjudicated is by a court of peculiar and exclusive jurisdiction and where no appeal is allowed, or revising power given by law, such adjudication is final and conclusive upon all other courts and persons, until *successfully impeached upon the charge of fraud*. *Lessee of Rhoades et al. vs. Selin et al.*, 4 *Wash. C. C. Rep.* 721; *Wilcox vs. Jackson*, 13 *Pet. Rep.* 511; *Gelston vs. Hoyt*, 1 *John. Ch. Rep.* 546; *Voorhees vs. The U. S. Bank*, 10 *Pet. Rep.* 478; *United States vs. Arredondo et al.*, 6 *Ib.* 729; *Blount and wife vs. Darrack*, 4 *Wash. C. C. Rep.* 659; *Foley vs. Harrison et al.*, 15 *How. U. S. Rep.* 448; *Borden vs. The State &c.*, 11 *Ark. Rep.* 547.

And embraced within this general principle are the adjudications of the Register and Receiver of Land Offices, as to the facts of possession, cultivation and other acts essential to the validity of the pre-emptor's right—questions directly submitted to them and adjudicated upon, and within their exclusive jurisdiction. See *Wilcox vs. Jackson*, 13 *Pet. Rep.* 511; *Nicks' heirs vs. Rector*, 4 *Ark.*

*Rep.* 283; 2 *Laws, Inst. and Ops.*, (*Ed.* 1838,) *p.* 85, *No.* 57; *Gaines et al. vs. Hale*, 16 *Ark. Rep.* 25; *McGhee vs. Wright*, 16 *Ill. Rep.* 557; *Mitchell vs. Cobb*, 13 *Ala. Rep.* 139; *Lytle et al. vs. The State et al.*, 9 *How. U. S. Rep.* 333; *Lewis vs. Lewis*, 9 *Misso. Rep.* 186; *Perry vs. O'Hanlon*, 11 *Ib.* 591; 12 *Ark. Rep.* 21, *et seq.*

And is binding in a court of chancery as well as other courts. 16 *Ill. Rep.* 557.

Even a surveyor appointed by act of Congress, to make a partition of lands, becomes, in that matter, virtually a *judge ;* and his act is *final* and *conclusive* in the absence of *fraud.* See *Haydel vs. Dufresne*, 17 *How. U. S. Rep.* 30.

Such judgments, or any other final judgments, may be impeached in equity for *fraud,* but never on account of an *irregularity.* See *Shottenkirk vs. Wheeler*, 3 *John. Ch. Rep.* 275.

And, however grossly ignorant such a court or officer may be of the duties confided, or regardless of the rights of parties, yet this cannot affect the jurisdiction, or impair the judgment, in the absence of fraud. See *Woodruff vs. Cook*, 2 *Edw. Ch. Rep.* 261.

We insist, as to the attempted imputation of fraud, made by wholesale in many of the answers, that *none of them* occupy a position to give them the right, in law or equity, to avail themselves of the charge, even were it as true as it is false.

None of them had any interest in the land, or any claim to it, of any sort, at the time the grant of the pre-emption was obtained: and even were it done by fraud, what right had any of them to complain? Was any one of them injured by it? It was a question between Cloyes and the United States alone; and none but the United States was, or could be injured by it, or have any ground of complaint. After the grant was made, if these defendants thrust themselves in, it was in *their own wrong.* They had not been injured: and if they so came into the controversy, they had *no grievance of their own* to redress; and had no right to intervene as the champions of the United

States, which, itself, was content with the grant to Cloyes, and satisfied that it was *fairly* and legitimately obtained.

Equity never admits of *volunteers* thus bringing up a law suit, and thrusting themselves into the controversies of others.

Fraud must be accompanied by injury, in order to entitle a party to redress. The party seeking relief must be damaged by the alleged act. See *Halls vs. Thompson*, 1 *Sm. & Marsh, Rep.* 489; *Irons vs. Reyburn*, 11 *Ark. Rep.* 389; *Cunningham vs. Ashley, &c.*, 12 *Ark. Rep.* 303, 320; 1 *Story Eq. Jur.*, sec. 203; *Co. Lit.* 357, *b.; Young vs. Bumpass, Freem. Ch. Rep.* 250; *Juzan vs. Toulmin*, 9 *Ala. Rep.* (*n. s.*) 684; *Conard vs. Nicall*, 4 *Pet. Rep.* 296, 310;. *United States vs. Arredondo, et al.*, 6 *Ib.* 716; *Meux vs. Anthony*, 11 *Ark. Rep.* 418; *Clark et al. vs. White*, 12 *Pet. Rep.* 196; *Edmondson vs. Hildreth*, 16 *Ill. Rep.* 215; 2 *Tenn. Rep.* 153.

A party who attempts to set aside the grant of a pre-emption, by the land officers, on the ground of fraud, must show that he was *injured by such fraud.* See *Cunningham vs. Ashley, &c.*, 12 *Ark. Rep.* 303.

And how could a man be *injured* unless he had an *interest* or claim, *at the time?*

If a fraud existed in this case at all, it was as much a *suppressio veri*, or more than an *expressio falsi;* and to constitute a fraud in such cases, the act suppressed must be such as *Cloyes*, one party, was under a legal or equitable obligation to communicate to *the other party*, and which such *other party* (the United States,) *had a right to know from him.* See *Juzan vs. Toulmin*, 9 *Ala. Rep.* (*n. s.*) 684; *Mills vs. Lee*, 6 *Mon. Rep.* 98, et seq.; *Taylor &c. vs. Bradshaw, Ib.* 149; 1 *Story Eq. Jur.* sec. 197, 207; *Young vs. Bumpass, Freem. Ch. Rep.* 249.

And what right had *any of these defendants* to have facts communicated to *them* by Cloyes about his pre-emption, *when they had no interest in the matter?* and only have come in now as *volunteers*, essaying to redress an alleged wrong inflicted on *another.* They are not even *assignees* of a *trust*, which they seek

614    CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY

to redress. And if they were, equity would order them out of its portals; for it takes cognizance of no such cases, in behalf of *assignees* or *volunteers*.

All of these *defendants*, at the time of the *contract* and *grant*, from the United States to Cloyes, by the land officers as its authorized agents, (for this grant is a contract,) were mere strangers to it, had no vested or other interest to be affected by it; and, in the language of the court, in the case of *Meux vs. Anthony et al.*, " *it is very clear, had no right to interfere with the contract made between them*," or " capriciously attempt to disturb it, though it might be ever so fraudulent." See 11 *Ark. Rep.* 418, 420, 422; also *Wynn vs. Morris et al.*, 16 *Ib.* 434.

In order to entitle persons to enquire into such alleged *fraud*, they *necessarily* ought to have had (which they had not,) a *vested interest* in the land *at the time of its perpetration*. See *Lightfoot vs. Colgin*, 5 *Munf. Rep.* 71; *Cook vs. Cook et al.*, 12 *Ark. Rep.* 387; 11 *Ib.* 418, *et seq.;* 16 *Ib.* 434; *Steel vs. Worthington*, 2 *Ham. Ohio Rep.* 192; *Coleman vs. Carr*, 1 *Walker Miss. Rep.* 258; 16 *Ill. Rep.* 215, &c.

The *grant* of the pre-emption right by *act of Congress* was a *contract:* and its *consummation* by the *land officers a contract.* See *New Jersy vs. Wilson*, 2 *Cond. Rep.* 457; *Fletcher vs. Peck*, *Ib.* 321; *McCracken vs. Hayward*, 2 *How. U. S. Rep.* 613.

And the preceding authorities on this question of fraud, abundantly show that *fraud* in a *contract* cannot be complained of by *third* person, *unless* interested in the *subject* matter of the *contract, at the time* of the fraud.

Where a person is actually imposed upon, by *fraud* in a contract, although he might himself have set it aside, yet, if he is content to let it stand, *his assignee* of the contract will not be permitted to come into court to *avoid it.* See 16 *Ill. Rep.* 215, to 217.

And are not every one of these defendants, in the most favorable attitude which can be assigned to them, but the *assignees* of the United States, the pretended party defrauded? And

OF THE STATE OF ARKANSAS 615

Term, 1857.] Lytle et al. (Cloyes' Heirs) vs. The State et al.

though the United States might have been heard to complain, these defendants, their assignees, cannot.

Besides, a *decree* was rendered in favor of the complainants' right to the land, by the Register and Receiver, which was *final*, and has been so adjudicated in this case; and they seek no aid from this court to *perfect* that decree or judgment, which is already *perfect in itself*. But, upon that decree or judgment, they are now prosecuting a suit for the *possession of their land;* for rents; to remove the cloud from their title, and to compel the defendants, who have stepped into Governor Pope's shoes, with notice of the trust which he was bound to execute, *to execute it themselves*—as trustees succeeding to the trust, which he ought to have executed by conveying the land to complainants. The decree of the land officers, whilst it stands, is *conclusive* as to the *title* of the complainants. It cannot be assailed *collaterally*. It can *only* be *impeached* for *fraud* in a *direct proceeding*, by either an original or *cross-bill*. And defendants not having so impeached, or attempted to impeach it, they cannot be permitted to speak about *fraud*, as a mere matter of *defence*. Such a thing is unheard of in the annals of chancery. See *Dooley vs. Dooley*, 14 *Ark. Rep.* 124; *Patterson vs. Taylor* 7 *How. U. S. Rep.* 159; *Saunders vs. Wood*, 15 *Ark. Rep.* 26; *Patterson vs. Hull*, 9 *Cow. Rep.* 756.

In the very correct language of this court, in the case of *Dooley et al. vs. Dooley, &c.*, the denial of the truth of the settlement (in this case of the valid allowance of the pre-emption,) " in the answer amounts to nothing." 14 *Ark. Rep.* 125.

In *Wynn vs. Garland*, Wynn claimed the land under the pre-emption act of 1838, and Garland claimed it through Hemphill's pre-emption under the act of 1830. Wynn's pre-emption was first proved up, but was set aside upon Hemphill's making his proof, and the patent was issued to Garland as assignee of Hemphill. It was contended in argument, that as Wynn's settlement and occupation were subsequent to Hemphill's, he could not impeach his title. But this was overruled, and Wynn's right to

impeach was put upon the ground *expressly*, that at the time Hemphill made his proof, " the claim of Wynn had vested in the land. See 16 *Ark. Rep.* 470, 471. This case fully sustains the rule we contend for: and in the case of *Bernard vs. Ashley et al.*, 18 *How. U. S. Rep.*, although the question is not decided in express terms, the view the court took of it appears clear enough.

In *Fermor's case*, 3 *Coke* 77, cited by Mr. Hempstead, the lessor was not only injured by the fraud, but the party committing the fraud was holding under him: and in *Rector vs. Welch*, 1 *Misso. Rep.* 238, the plaintiff's right to impeach the pre-emption certificate, was, by the court, put upon the ground that his title was the oldest of the two. He occupied the position that the appellees do *not* occupy here. They are assailing an *older*, not a *younger* right.

And here we might safely rest our case; because the foregoing principles and authorities, decisions of the highest tribunals in the Union, including this honorable court, *have settled most conclusively that none of the appellants and appellees have any right in this controversy, that can be litigated in this forum*, or which have any claim to its interposition.

Much has been said in this case, on the part of the defence, as to *lapse of time, stale demands*, sleeping on pretended rights, *statute of limitations*, and the like, none of which have any lodgment, whatever, amongst the facts, either alleged or proved.

And first, how could any statute of limitations apply to Fowler, who had no right, until after the suit was commenced? And if he acquired a right, *pendente lite*, from those entitled to protection by minority, does not he step into their stead, precisely as their right stood, when they transferred to him? To present their objection on this point, is a response to it. A purchaser, *pendente lite*, may be made a party to the suit, either plaintiff or defendant, though not often necessary that he should be. See *Carman vs. Watson*, 1 *How. (Miss.) Rep.* 333; *Story Eq. Pl.* sec. 156, 194; *Sugden on Vend. (Am. Ed.* 1828,) *p.* 527, (737.)

Cloyes, the pre-emptor, died *before* the title passed from the United States Government; and the statute could not have commenced running in his life-time, both for this reason, and because he himself had exclusive possession. Because, until the title passes out of the government, the statute never begins to run. See *Bledsoe vs. Doe &c.*, 4 *How.* (*Miss.*) *Rep.* 23; *Lindsey vs. Miller, Lessee*, 6 *Pet. Rep.* 673; *Spellman vs. Curtenius*, 12 *Ill. Rep.* 415.

When the title passed from the government, whether we look to the patent to Governor Pope, or the entry made by Cloyes' heirs, such heirs were *all minors;* so all of them continued to be, until the 17th day of June, 1843, when the eldest arrived at full age; consequently, neither lapse of time, or statute of limitations, as to any intermediate right, or adverse possession, could have any place or begin to run until the 17th of June, 1843, which was after the suit was instituted. Indeed, the law seems to be well settled, and reason is with it, that the statute could not begin to run, until the youngest minor arrived at full age, which was on the 22d of January, 1847, some four years after the suit was commenced, and only about four years prior to filing the amended bill, making new parties.

For, where *all* the complainants are minors, when the cause of action accrued—when possession was taken by defendants—they are within the saving provision of the statute of limitations, and it does not begin to run against them until they all arrive at full age. See *Shute vs. Wade*, 5 *Yerg. Rep.* 9; *McIntire vs. Funk*, 5 *Lit. Rep.* 36; *Carter vs. Cantrell*, 16 *Ark. Rep.* 164.

And, even if all the complainants had been adults, the statute could not begin to run against them, until there was an adverse possession of the land. *Harlock vs. Jackson*, 1 *Const.* (*S. C.*) *Rep.* 135; *Rose vs. Daniel*, 3 *Bre. Rep.* 444; *Brown vs. Kimball*, 25 *Wend. Rep.* 267. And adverse possession, in order to protect a defendant, under the statute of limitations, will never be presumed, but must be proved. *Smoot vs. Mathew*, 8 *Misso.*

48c

*Rep.* 525; *Jackson vs. Sharpe* 9 *J. R.* 167; *Jackson vs. Waters,* 12 *Ib.* 168.

And each defendant here must stand upon his own possession alone, personal or derived, and cannot protect himself by the separate possession of any co-defendant. For where a tract of land is subdivided into different lots, as this was, the occupancy of one or more of those lots does not give a constructive possession, or create an adverse possession of other parts, or lots, of the tract. See *Jackson vs. Richards,* 6 *Cow. Rep.* 623.

And any adverse possession commenced during plaintiff's infancy cannot affect his rights, until the number of years given by the statute of limitations expire for him to commence suit in, after infancy ceases. *Hudson vs. Hudson, Munf. Rep.* 357.

Now, if it has been alleged and proven, (which we deny,) that any of these defendants were in actual adverse possession of part of the land, prior to the enforcement of the limitation act of March 29th, 1839, and for seven years had held such possession, and paid taxes on the land, (which has not been proved,) the plaintiffs would, nevertheless, by the Territorial statute, have been entitled to *seven years* after their disabilities had been removed, within which to sue. See *Steele & McCampbell's Digest, p.* 382, *sec.* 3. Consequently, against such occupants, if any, plaintiffs would have been exempt from the statute of limitations until the 22d day of January, 1854—seven years after the arrival of the youngest at age: or, at any rate, until the 17th day of June, 1850—seven years after the eldest arrived at age.

Under the statute, then, it is utterly impossible that any defendant can be protected against the plaintiffs' rights.

And this view of the statute of limitations, which seems to be well settled, as a general principle, is clearly confirmed by our statute of the 20th March, 1839, the one applicable to most of the defendants, and which does not fairly admit of any other construction. See *Ark. Digest,* (*Ed.* 1848,) *p.* 695, *secs.* 3, 4.

This act gives minors five years after they arrive at full age, to sue: which would have protected them until the 22d January, 1852, long after all the bills were filed. Under this statute it cannot be doubted, that *all* the minor children of the pre-emptor must be embraced in the word "person," and *all* protected under it, until *all* arrived at full age.

Again, on the 12th March, 1840, two of the heirs, Mrs. Hooper and Mrs. Lytle, were *feme coverts*, and the other a minor; and those who, on that day, or afterwards, took possession, entered, and the cause of action arose, when all the heirs were minors, and two of them married women: hence, as to them, the statute of limitations has not yet begun to run, and cannot, until all of the disabilities have been removed. Whilst Mrs. Lytle, who still lives, remains a *feme covert*, all are protected against the statute. See *Ark. Digest*, (*Ed. of* 1848,) *p.* 700, *sec.* 30; 5 *Yerg.* 9; 5 *Litt. Rep.* 36; 16 *Ark. Rep.* 164; *Mercer vs. Selden*, 1 *How. U. S. Rep.* 52; *Demarest vs. Winkoop*, 3 *John. Rep.* 138; *McFarland vs. Stone*, 17 *Verm. Rep.* 174.

And as to the statute of limitations, all the rights, benefits, or disadvantages, and all the rules applicable to ejectment, must be applied, in equity, to this case. *Kane vs. Bloodgood*, 7 *John. Ch. Rep.* 113; *Frame. vs. Kenny*, 2 *A. K. Marsh. Rep.* 145; *Coulson vs. Walton*, 9 *Pet. Rep.* 82.

Even if true, that Fowler is not properly a party, yet, the complainants, who are rightfully such, cannot be prejudiced by it. They should neither be barred by decree nor turned off to begin a new suit. But on the hearing, the name of any discovered to have no right should have been stricken out, by order of the court, and a decree rendered in favor of the others, who were shown to have title. *Tallmadge vs. Pell*, 9 *Paige Rep.* 412; *Story's Eq. Pl. sec.* 283. And this would be the proper course, in the discretion of the court, in equitable suits at law. *Lillard vs. Rucker*, 9 *Yerg. Rep.* 74; *Carson vs. Smart*, 12 *N. C. Rep.* (*Ire. Law*) 370.

As to the question of the pretended or alleged invalidity of

the deeds made to Fowler, by his co-plaintiffs, it is of very slight importance in this case, except merely to have the law correctly laid down, as the question is, for the first time, presented to this court.

If invalid, it cannot affect the decision or result of the case; because his name would simply be stricken from the record, and a decree rendered in favor of those entitled to it.

And first, who has any right, in law or equity, to question these conveyances, but his co-plaintiffs, who are still co-operating with him? Nobody else.

These conveyances are not illegal, on account of the adverse possession, (as in old times they would have been in England,) because, good sense has repudiated that folly; and so has the Legislature of Arkansas. See *Digest,* (*Ed.* 1848,) *p.* 265, *sec.* 6.

There is no statute here declaring such contracts champerty or maintainance; and, consequently, we have only to look to the common law of England, as liberalized in modern time, and as modified by the statutes of *Edward* and *Henry,* which are, to some extent, in force in Arkansas.

No *penalty* exists against it here; and if declared illegal by our courts, it can only be upon the ancient rule of law, in the dark ages, which has now become obsolete even in England.

Under the common law, as now administered and modified by the two British statutes above referred to, in order to render such a conveyance invalid, the title purchased must be a legal one, from a private person, not at a judicial sale, and must be held adversely. See *Whitaker vs. Cone, in note,* 2 *John. Cas.* (*Ed.* 1848,) 59.

Hence, our statute authorizing the sale of lands held adversely, must operate as a repeal of the English statutes.

And where there is no statute against it, it is as competent for a litigant to regulate the amount of his attorney's fees, by the value, or half the value, or any other part of the value of the property in controversy, as in any other mode. *Wilhite vs. Roberts,* 4 *Dana Rep.* 174.

*Champerty* is defined to be a bargain with the party litigant, to have part of the thing in suit, if he prevail thereon, for the maintainance of the suit.   *Williamss vs. Protheroe*, 3 *Younge & Jerv. Rep.* 135.

In these deeds, there is no condition at all for the maintainance of the suit; no money to be advanced; no condition or contingency, whatever; but they are absolute and unconditional, as compensation for his services only, let the suit go as it may. How can such a contract be champertous?   See 2 *Yerg. Rep.* 118.

The contract in the above case of *William vs. Protheroe*, was declared not to be invalid; yet, in that case, the vendee agreed to bear the expenses of the suit, then already commenced by the vendor, against the occupant of the land, for by-gone rent, and was to have the rent to be recovered, and was to bring another suit, bear the expenses, and receive the rents in like manner.

Even a fee absolutely and unqualifiedly contingent, and part of the property recovered will be enforced in equity.   *Wylie vs. Cox*, 15 *How. U. S. Rep.* 419.

And whatever may have been the ancient or modern views, as to the morality or legality of such contracts, where statutes existed against them; it is clearly settled in law, as well as in morals, that where no such statute is in force, it is considered a grave and highly honorable duty of the profession to investigate the claims, and aid in redressing the wrongs of the indigent and injured; and if such indigent person, who, in the opinion of the attorney, has probable cause of action, employ him and agree to pay a large fee, unconditionally, let the suit eventuate as it may, although the large fee might be wholly worthless unless the suit were gained, yet such contract would not be champertous: and this, although the ability of the client to pay depends wholly on the success of the suit.   *Moore vs. McCampbell Academy*, 9 *Yerg. Rep.* 118; *Smith vs. Thompson*, 7 *Ben. Mon.* 310; *Shapley vs. Bellows*, 4 *N. Hamp. Rep.* 355.   In such cases the attorney may even lawfully advance money, necessary to the prosecution of

the suit, *on the credit of the cause.* 4 *N. Hamp. Rep.* 355; 3 *Younge & Jervis Rep.* 131.

And that reasonable contracts of the kind, such as this, should not only be tolerated, but encouraged within proper bounds, could not be better illustrated than by the facts of the present case itself.

S. H. HEMPSTEAD, for appellees. The proposition now to be considered is, whether the decree of the Chancellor ought to be affirmed; and I propose to present the various questions growing out of it, reserving for the last the main ground of defence, namely: that the pre-emption of Cloyes was a gross fraud on the law, and was fraudulent in fact.

And first: it appears that one of the complainants, Fowler, is to receive a part of the claim for the prosecution of it; and we are to consider whether this fact falls within the definition and meaning of *Champerty.*

A person is not permitted, either as an attorney or solicitor, or as counsel, to contract with his client previous to the termination of the suit, for a part of the demand or subject matter of the litigation, as a compensation for services. *Thurston vs. Percival,* 1 *Pick.* 415; *Livingston vs. Cornell,* 2 *Mart. La. Rep.* 281; *Key vs. Vattier,* 1 *Ham.* 132; *Rust vs. Larue,* 4 *Litt.* 411; *Caldwell vs. Shepherd,* 6 *Mon.* 389; *In re Beakley,* 5 *Paige* 311; *Merritt vs. Lambert,* 10 *Paige* 355.

No attorney can be permitted to buy in things in a course of litigation, of which litigation he has the management. *Hall vs. Hallett,* 1 *Cox's Chan. Cas.* 139, *per Ld. Hardwicke; Miles vs. Esurie,* 1 *McCord's Ch. Rep.* 524.

*Hawkins* says, champerty is "the unlawful maintainance of a suit in consideration of some bargain to have part of the thing in dispute, or some profit out of it. 1 *Hawk. P. C.* 463; 2 *Inst.* 208; *Co. Lit.* 368; *Stanly vs. Jones, Moore & Payne* 193; *S. C.* 7 *Bing.* 369. All maintainance, says *Hawkins,* is strictly pro-

hibited by the common law as having a manifest tendency to oppression, by encouraging and assisting persons to persist in suits which, perhaps, they would not venture to go on in, upon their own bottoms. 1 *Hawk. P. C.* 472.

Maintainance of which champerty is a branch, is an offence at common law. 2 *Inst.* 208; 1 *Russell on Crimes*, 182; 6 *Bac. Abr. Maintainance (C.)* 414; *Peckel vs. Watson*, 8 *Mees. & W.* 691.

A contract amounting to champerty is not voidable merely as between the parties to it; but is absolutely void. *Thurston vs. Percival*, 1 *Pick.* 417; *Merritt vs. Lambert*, 10 *Paige* 352; *Arden vs. Patterson*, 5 *Johnson's Ch. Rep.* 44; 18 *Vesey Jr.*, 501.

"The purchase of a law suit by an attorney is champerty," (says Chancellor KENT, in the last cited case, 48,) "in its most odious form; and it ought equally to be condemned on principles of public policy. It would lead to fraud, oppression and corruption. As a sworn minister of the courts of justice, the attorney ought not to be permitted to avail himself of the knowledge he acquires in his professional character, to speculate in law suits. The precedent would tend to corrupt the profession, and produce lasting mischief to the community." And the Chancellor set aside the contract in that case as void in law, and necessarily leading to fraud and corruption.

In *Strachan vs. Brander*, 1 *Eden* 303, the Lord KEEPER ordered a bond taken by an attorney, to be delivered up as unconscionable, savoring of champerty and dangerous to public justice. *Wallis vs. Duke of Portland*, 3 *Ves. Jr.*, 494. There are numerous cases, in which, on principles of public policy, the court will not suffer a contract between an attorney and client to stand. *Arden vs. Patterson*, 5 *Johnson's Chan. Rep.* 49. And in *Wood vs. Downes*, 18 *Vesey* 120, an agreement between the attorney and client was set aside, because it savored of champerty.

In equity, although a transaction may not strictly answer the

definition of champerty, yet, an agreement which savors of that illegality cannot be enforced. *Burke vs. Green*, 2 *Ball & Beat.* 522; *Conny vs. Caulfeild*, id. 268; *Marques Chomondeley vs. Lord Clinton*, 2 *Jac. & Walk.* 136; *Powell vs. Knowler*, 2 *Atkinson* 224.

In *Stevens vs. Bagnell*, 15 *Vesey Jr.*, 156, Sir WILLIAM GRANT, Master of the Rolls, said an agreement which amounted to that species of maintainance called champerty, *viz:* the unlawful maintainance of a suit in consideration of a bargain for part of the thing or some profit out of it, was void from the beginning.

And BLACKSTONE says, champerty signifies the purchasing of a suit or right of suing; and, he adds, "these pests of civil society that are perpetually endeavoring to disturb the repose of their neighbors, and officiously interfering in other men's quarrels, even at the hazard of their own fortunes, were severely animadverted on by the Roman law, and they were punished by the forfeiture of a third part of their goods and perpetual infamy." 4 *Bl. Com.* 135.

The distinction between maintainance and champerty seems to be this: where there is no agreement to divide the thing in suit, the party intermeddling is guilty of maintainance only; but where he stipulates to receive part of the thing in suit, he is guilty of champerty. 7 *Dow. & Ry.* 846; 5 *Barn. & Cres.* 188. And any person, not a party, may avoid it, in the same manner as any illegal contract may be avoided. There can be no question that the contracts between Absalom Fowler, the attorney, and the heirs of Cloyes, his clients, were champertous.

Fowler, having no interest recognized by law, improperly made himself a party complainant to the bill; and the only enquiry is, as to the effect of that movement.

It must certainly appear that all the complainants have an interest in the subject matter of the litigation. *King of Spain vs. Machado*, 4 *Russ.* 225; *Cuff vs. Platell*, 4 *Russ.* 242; *Dias vs.*

*Bonchand,* 10 *Paige* 464; *Clarkson vs. De Peyster,* 3 *Paige* 336. See, also, *Clason vs. Lawrence,* 3 *Edw. Ch. Rep.* 52; *Story's Eq. Pl,* 279, 280; *Yeaton vs. Lenox,* 8 *Peters* 123.

A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence; where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced; and, therefore, from the beginning of this jurisdiction there was always a limitation to suits in this court. *Smith vs. Clay,* 3 *Bro. Ch. Rep.* 639, 640. These principles are fully adopted in *Bowman vs. Wathen,* 1 *How. S. C. Rep.* 189. This doctrine of an equitable bar by lapse of time, has been ruled in the Supreme Court, in a variety of cases, and has become the settled law of that court. *Prevost vs. Grats,* 6 *Wheat.* 481; *Hughes vs. Edwards,* 9 *Wheat.* 489; *Miller's Heirs vs. McIntyre,* 6 *Peters* 61; *Piatt vs. Vattier,* 9 *Peters* 405; *McKnight vs. Taylor,* 1 *How. S. C. Rep.* 161.

Courts of equity, by their own rules, independently of any statutes of limitation, give great effect to length of time, and they refer frequently to the statutes of limitation for no other purpose than as furnishing a convenient measure for the length of time that ought to operate as a bar in equity of any particular claim or demand. *Beckford vs. Wade,* 17 *Vesey* 87; *Mason vs. Crosby, Davis Rep.* 313.

In *Harpending vs. The Dutch Church,* 16 *Peters* 486, it was decided that if it appears by the bill that the complainant, by the statutes of the state, has no standing in court, and for the sake of repose and the common good of society, is not permitted to sue his adversary, it is the rule of the court not to proceed further, and dismiss the bill. And this, where lapse of time is not relied on, as it is in the answers in this case, as a substantive ground of defence. And the Supreme Court of Arkansas, in *Taylor vs.*

49c

626        CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.        [JANUARY

*Adams*, 14 *Ark*. 62, acted on the same doctrine, holding that the objection, as to the staleness of the demand, need not be plead or insisted on in the answer, but might be made at the hearing; and indeed that when the proofs disclosed such a case, the court would of its own motion deny relief to a party who had slept on his right.    *Davis vs. Tarwater*, 15 *Ark*. 295.

The lapse of time, sufficient to create a bar, must, in a great measure, depend on the circumstances of each particular case. Less than the period of limitation will sometimes be sufficient; although generally, the court will adopt the period prescribed by the statute of limitations, and hold equitable rights barred in the same time legal rights would be barred at law.    *Miller vs. Mc-Intire*, 6 *Peters* 61; *Elmendorf vs. Taylor*, 10 *Wheaton* 152; *Demarest vs. Winkoop*, 3 *Johns. Ch. Rep.* 139.

Every one having a claim is required to bring it forward in a reasonable time.    Laches and neglect are discountenanced, and the public good requires that there should be an end to litigation.

It is clear, that laches and neglect have attended the prosecution of this claim.    The proof of Nathan Cloyes was filed in the District Land Office at Batesville, on the 23d April, 1831; and the pre-emption allowed on the 28th May, 1831, as to the land in controversy.    The defendants claim under a purchase at public sale on the 4th Monday in October, 1833, and possession since that time.

The possession of successive holders of land under the same title may be added together to make out a complete defence under the statute of limitations.    *Alexander vs. Pendleton*, 8 *Cranch* 470; *Angell on Limitation*, 446, 447; *Overfield vs. Christie*, 7 *Serg. & Rawle* 177; *Melvin vs. Proprietors of Locks*, 5 *Met.* 15; *Fanning vs. Wilcox*, 3 *Day* 269.

And in Kentucky it has been held, that it can make no difference whether the possession be held uniformly under one title or at different times under different titles, nor whether the possession be held by the same or a succession of individuals, provided

the *claim* of *title* has been *adverse* to that of the plaintiff, and the *possession* has been *continued* and *uninterrupted*. *Shannon vs. Kin ney*, 1*A. K. Marsh.* 4; *Hord vs. Walton*, 2 *A. K. Marsh.* 620; *Angell on Limitation*, 448.

It is not necessary that the person claiming the benefit of the statute of limitations, should have a good title, or any title but possession. Hence, *color* of *title* even under a *void* and *worthless deed*, has always been received as evidence that the person in possession claims for *himself*, and, of course, adversely to all the world. *Pillow vs. Roberts*, 13 *How. S. C. Rep.* 472; *S. C.* 7 *Eng.* 822.

In this case, the title of defendants had its inception on the 15th June, 1832, the date of the grant of the 1,000 acres. The selection in January, 1833, and the patent in November, 1833, *had relation back to that time, as far as title is concerned*. There is no rule better founded in law, reason, and convenience than this, that all the several parts and ceremonies necessary to complete a conveyance, shall be taken together as one act, and operate from the substantial part by relation. 5 *Cruise's Digest*, 510, 511; *Jackson vs. McCall*, 3 *Cowen* 80; *Heath vs. Ross*, 12 *Johns.* 140; *Landes vs. Brant*, 10 *How. S. C. Rep.* 372; *Lessieur vs. Price*, 12 *How. S. C. Rep.* 77; *Peyton vs. Stith*, 5 *Peters* 492.

It would seem to be clear enough, that no right could accrue to the heirs of Cloyes before the 5th of March, 1834, when the entrance money was allowed to be received under the direction of the Secretary of the Treasury for the purpose of allowing an asserted right to be tried, and not to give any new right. No right then accrued, as will be hereafter shown. But let us take that, for argument sake, as the proper point of time, and see how the question stands on the score of limitation, supposing that a valid right existed.

By the act of limitation, which went into force 20th March, 1839, every action for the recovery of lands or tenements, or the possession thereof, was prohibited, where the plaintiff, his ancestor, predecessor or grantor, had not been seized or possessed

628    CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY

within ten years before the commencement of suit. It contained a saving in favor of minority, insanity and coverture; and allowed five years after such disability should be removed to sue. *Digest*, 495, 496.

When the cause of action or right accrued, infancy was the only disability. The females subsequently married, but the statute itself forbids the accumulation of one disability upon another, where they do not spring into being at the same time. *Digest*, secs. 28, 30, *p*. 700. Were it otherwise, "a right might travel through minorities through two centuries." 3 *J. C. Rep.* 139.

And without any statutory provision this doctrine would be enforced, because it has long been perfectly well settled that disabilities cannot be accumulated upon each other, to save the right when they do not *all exist at the accrual of the cause of action.* And the reason is, that where the statute has once begun to run, it will not be impeded by any subsequent disability; and because, otherwise, there would practically be no limitation at all. This has been the rule from the statute of 21 James I., down to this time—a period of more than two hundred years. *Angell* 520, 521, 522, 523; *Guion vs. Bradley Academy*, 4 *Yerger* 250; *Doe vs. Shane*, 4 *Term Rep.* 307; *Eager vs. Commonwealth*, 4 *Mass.* 182; *Demarest vs. Wynkoop*, 3 *Johns. Ch. Rep.* 135; *Parsons vs. McCracken*, 9 *Leigh.* 495; *McCoy vs. Nicols*, 4 *How. Miss. Rep.* 31; *Hudson vs. Hudson*, 6 *Munf.* 352; *Fitzhugh vs. Anderson*, 2 *Hen. & Munf.* 289; *McDonald vs. Johns*, 4 *Yerg.* 258; *Crozier vs. Gano*, 1 *Bibb* 257.

What, then, is the effect of the bar, operating on some of the complainants, but not upon all? What is the effect on the suit? The following cases will show, that if one is barred all are barred. 3 *Murph.* 577; 7 *Cranch* 157; 3 *Ala.* 747; 1 *Lit. Sel. Cas.* 436; 1 *A. K. Marsh.* 39; 2 *A. K. Marsh.* 384; 3 *A. K. Marsh.* 362, 554; 4 *Day* 310, 265; 4 *Bibb* 412; 10 *Ohio* 11, 135; 2 *Litt.* 109.

In the case in 3 *A. K. Marsh.* 554, just cited, the court said

it was settled that the whole of the plaintiffs must labor under some disability to prevent the statute from operating as a bar, and that when the statute run against one, it run against all. 1 *Litt.* 296.

And so, where there has been an *adverse possession* during the time limited by the statute against tenants in common, one of whom is within the saving of the statute, the right of the others is not thereby saved. And so, if an estate descend to parceners, one of whom is under disability which continues for more than twenty years, the disability of the one does not preserve the title of the other. *Angell* 529, 530.

In *Marsteller vs. McClean*, 7 *Cranch* 156, it was decided in an action of trespass brought by several plaintiffs who were co-tenants, and where a disability existed as to some, not all, that when the statute runs against one of two parties entited to a joint action, it operates as a bar to such action. *Lahiffe vs. Smart*, 1 *Bail.* 192.

In this case the right was joint, and no several actions could have been brought by the heirs of Cloyes; they were all bound to unite; and hence, it must follow that the loss of remedy by one is the loss of remedy by all, and that the adverse possession of the defendants is operative against all. Were it otherwise, the law would not be consistent with itself; nor would acts of limitation become acts of repose.

It has been already demonstrated, that among several complainants, all must have right or none can recover; and as there are certainly two of the heirs barred by limitation, it follows, that as to the defendants alluded to, the bill was properly dismissed.

When the proof of pre-emption, supposing it at present to have been entirely sufficient, was taken and filed at the District Land Office at Batesville, on the 23d of April, 1831—the township plat had not been returned, and was not then in the District Land Office. The surveys had not been completed. We take it to be a settled proposition, that, until the public lands

630    CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY]

of the United States are regularly surveyed according to law, by the proper authority, the surveys returned to the Surveyor General, and approved by him, and plats thereof filed in the District Land Offices, those officers have no jurisdiction over the public lands for any purpose whatever. Indeed, it is the mode designated by law, and the only one by which they know what are public lands, and what are reserved from sale and entry. They cannot sell or allow entries. The President himself—no department of the government could do it, for the latter are just as much bound by law as subordinates, and can only move in accordance with it.

There was no tender or offer to pay the government price for the land on the day of the allowance of the pre-emption, (28th May, 1831:) the offer to pay and the tender are of the essence of the right. A tender is not a mere formal matter—a ceremony that may or may not be performed at pleasure. Mr. Attorney General BUTLER, in an opinion dated 27th April, 1837, says: "A tender of payment made in due time, and of the requisite amount, is sufficient in ordinary cases between individuals to save the rights of the party making the tender. The same principle, in my judgment, should be applied, by the General Land Office, to cases arising under the land laws." He further says, a person claiming a right to enter several tracts, and making a tender for the whole takes upon himself the duty of showing that he has a legal right to purchase the whole, and if he fails as to one, the whole tender will be vitiated. In other words, the party making a tender in this form, does it at his own peril: and if it proves to be bad in part, it must, as a consequence of the character he has given it, be bad for the whole. 2 *Op. & Ins.* 118. And in this he is clearly sustained by the best authority. 9 *Bac. Abr. Tender (B.)* 313. A tender must be unconditional, for otherwise it will be bad; and if bad in part, it is bad as a whole. The money must be actually produced at the time of tender, or the production must be dispensed with expressly, or by some equivalent act. 10 *East.* 101; 2 *Maule & Selwyn* 86; 15 *Wend.* 638.

The tender is a production and manuel offer of the money, and regularly it should be counted down. *Dickinson vs. Shee*, 4 *Esp*. 68; *Brady vs. Jones*, 2 *Dowl. & Ryl*. 305; 5 *Term Rep*. 432.

In *Nicks' Heirs vs. Rector*, 4 *Ark*. 285, it was decided to be necessary to tender the purchase money to the government, before the pre-emption right became complete and fixed. In that case, the land officer refused to receive the moneys when tendered.

In the case of *Cunningham vs. Ashley*, 14 *How*. 277, it is very clear that a tender is held necessary, and without which, indeed, Cunningham never could have succeeded in establishing his preemption.

If the land officers were competent to take proof of the preemption, they were equally competent to receive the money for the land covered by the pre-emption, and might have held it until a formal entry could have been permitted, if in other respects proper. If one was good, so would the other be against the government.

The payment made by Ben Desha, on the 5th of March, 1834, for the heirs of Nathan Cloyes, cannot relate back to the proof of the pre-emption, because intervening rights had sprung up. Conceding, for the sake of argument, that it would be good as against the government itself; yet, it could not be, as against the government's grantee. But that payment was wholly unauthorized by law; for the reason that the official township plats had not then been returned to the Register's office.

It has been insisted that all the objections made to the pre-emption right of Cloyes have been decided against the defendants, and the claim established by the decision of the Supreme Court, in 9 *How. Rep*. 328, and cannot now be assailed or impeached except for fraud. It is true, that that decision is the law of the case as *then* presented ; but it only decides that, on the face of the bill, the complainants appeared to have a valid pre-

632   CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.   [JANUARY

emption right; that decision never could have been made on such facts as have now been introduced.

It has been said that, supposing a fraud to have been committed by Cloyes; yet, as the title of the defendants had not accrued at the time that fraud was perpetrated, they cannot, on an after acquired title, contest it, and cannot resist it now.

I understand it to be clear and indubitable law, that the decision of the land officers, allowing a pre-emption, is only conclusive where there is jurisdiction of the subject matter, where they proceed in obedience to, and not against law; and in the absence of fraud or unfairness. 2 *Op. & Ins.* 92; *Wilcox vs. Jackson*, 13 *Peters* 490; *Nick's heirs vs. Rector*, 4 *Ark.* 284; *Lytle vs. The State of Arkansas*, 9 *How. S. C. Rep.* 333. And in the case of *Wynn vs. Garland*, 17 *Ark. Rep.*, a pre-emption claim, which had been patented was set aside, and the patent canceled; because it appeared by proof that the claim was allowed, by the land officers, on evidence as to cultivation, which was either false or mistaken. And that was not as strong a case as that now before the court.

A decision, obtained by fraud or unfairness, may be assailed by any one, who has a right at the time of such assailment, which may be affected by it, whether he had a right or title before or not. It is a rule as old as the law itself, that fraud will vitiate every thing—acts of the legislature—judgments and decrees of courts and solemn deeds and contracts between men. *Fermor's case*, 3 *Co.* 77; 2 *Pickering* 192. It would be strange, indeed, if the *Ex parte* action of land officers, based on *Ex parte* affidavits, without any knowledge, on their part, whether such affidavits were true or false, and without any *litis contestatio*, or means by cross-examination, or otherwise, to ascertain the truth, and the whole truth; I say, it would be strange doctrine, that their action, or decision, if such it may be called, might not be questioned by any one interested, on account of want of jurisdiction, or being against law, or for fraud, or mistake. In *Rector vs. Welch.* 1

*Mis. Rep.* 335, it was held that the certificate of a land officer of a right of pre-emption, might be shown to have been procured by fraud or imposition, or to have been issued on an insufficient state of facts, and thus destroy its validity.

No argument can be needed to prove that the establishment of a pre-emption claim under the act of 29th May, 1830, without the occupation and cultivation required by that act, was a fraud of the worst imaginable character, and upon which every court and every person should frown with indignation. That the fraud has been shown in this case, by facts, beyond a reasonable doubt, no fair and candid mind can deny; and it cannot be possible that it is to be either covered up or upheld by technical rules or advantages, to the shame and reproach of justice.

Suppose it to be true, that the defendants have no title, or hold under defective titles, does it, therefore, follow that the complainants must succeed? Must they not at last prevail on the strength of their title, if they have any—succeed on their superior equity, if any exists? This is a court of equity, and can they recover without equity? Before the court will look to see whether the defendants have any title at all, it will first determine whether their claim, set up in the bill, is just and equitable; and if it is found to be infected with fraud, the court will remain passive—not move another step—and dismiss those prosecuting an unworthy claim, from its forum, to seek any other remedy they may have. Nothing can call the powers of a court of equity into action but good faith, conscience, and diligence, and when these are wanting, the court does nothing.

In no case, where a right asserted, has its inception in fraud, will a court of equity grant any relief whatever. It makes no difference, whether there is any defence or, not; because the court will not outrage all the principles of equity, by lending its hand to consummate a fraud, or enable a party, or those claiming under him, to reap the fruits of it. On this, and other points in the case, I invite attention to the able opinion of the Chancellor, presented and appended to this argument.

50c

Mr. Justice Scott:

This cause was brought here by appeal from the Chancery Court for Pulaski county.

The land in controversy is the north-west fractional quarter of section numbered two, in township number one north, range No. 12 west, east of the Quaqaw line, containing, according to the government surveys, thirty acres and 88-100 of an acre.

The original bill sought the recovery of this tract together with other adjoining lands. The allegations of that bill are sufficiently stated in the reports of the case in 7 *Eng. Rep.*, *p. 9 to* 21, and in *Howard's Rep.* 315, and need not here be repeated.

That bill was filed on the 23d of May, 1843. The cause having been taken to the Supreme Court at Washington, and remanded to this, the decree theretofore rendered was reversed and set aside in this court, and the case made upon that bill was remanded to the chancery side of the Circuit Court of Pulaski county, in the July term, 1850, with instructions, in accordance with the mandate of the Supreme Court at Washington, to overrule the demurrer to the bill, and give leave to both parties, complainants and defendants, to amend their pleadings, if they should request such leave, that the merits of the case might be fully presented as equity should require.

On the 17th of January, 1851, the parties complainants filed their first amended and supplemental bill, reciting the former proceedings thereon, exhibiting the interest of Absalom Fowler, acquired during the pendency of the original bill, *to wit :* by deeds bearing date, respectively, the first day of May, 1843, the 9th day of June, 1843, and the 10th day of July, 1850, expressing upon their face to have been executed upon the consideration of the "services" of the grantee, "rendered and to be rendered," in a suit or suits for the recovery of the land in controversy—abandoning all claim to the adjoining fractions of land, and confining it to the land now in controversy—alleging the death of some of the defendants, and as to some of whom, seeking an abatement

of their suit, and as to others, a revivor against their representatives; and making Charles P. Bertrand, Elias N. Conway, Thomas D. Merrick, Joseph Fenno, Alexander George, Louis George, Michael Tanti, Lemuel H. Goodrich and John J. Budd, new defendants: alleging that Nathan Cloyes, the elder, died in the summer of 1831; that, after his death, his widow and children resided upon the tract of land in controversy, in the exclusive possession thereof, and without molestation, until after they had paid the money for the same to the Receiver of Public Moneys, when they were unceremoniously put out of possession thereof by Governor Pope, and other influential men. That, at the death of Nathan, the elder, his four children were infants, the eldest of them, Lydia L., having been born on the 7th day of June, 1822, and married to the said Robinson on the 24th of January, 1839; that Mary E. was born on the 17th of April, 1824, and was married to the said Elias on the 12th of March, 1840, and died in September, 1850; that Nathan H. was born on the 22d of January, 1826, and William Thomas was born on the 26th of June, 1828, and died in the year 1840. That the new defendants above named had unlawfully entered upon the land in controversy, on separate plats and parcels thereof, at various and different periods of time, counting from one to twelve years back, with full knowledge of the rights of the complainants, and had so ever since respectively held and enjoyed the same. That the patent issued to Governor Pope, under which they claim title and possession, was issued by mistake or fraud, without any authority of law, and is null and void, and that each of said defendants well knew the same before acquiring any of their pretended rights, interests and title. And praying discovery, and for the possession of the land in controversy; and for a decree for rents and profits, and that the rights, titles and interests of the defendants may be divested and their muniments of title canceled, and that the title of the complainants may be quieted and made perfect, and for relief as prayed in the original bill, and for general relief.

On the 24th day of January, 1853, the complainants filed a fur-

636     CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

ther amendment to their bill of complaint, which, after reciting the substance of the matters before set out, charges that on the 11th of May, 1833, the Commissioner of the General Land Office decided, and by letter of instruction of that date, communicated his decision to the Register at Little Rock, that no location could be made by the Governor of Arkansas, under the act of Congress making the 1000 acre grant upon lands to which a pre-emption right had been proved and recognized under the acts of the 29th of May, 1830, and the 14th of July, 1832. That on the 2d day of November, 1833, the Commissioner, by a letter of that date, officially instructed the Register and Receiver at Little Rock, in relation to pre-emption claims within the limits of Gov. Pope's location, that under directions to him by the Secretary of the Treasury, such pre-emption claimants, meaning thereby the said Nathan Cloyes's specially, should, at their election, either complete payments or withdraw them if already made: but that patents were not to be issued to them, and that if payments were made, in addition to the ordinary entries thereof made upon the books of the Land Office at Little Rock, and returns to the General Land Office, the officers at Little Rock should note the fact of the interference of such sales with the Governor's locations, and refer to the Secretary's decision, and also make similar entries upon the receipt and certificate of purchase. That afterwards, on the 5th of March, 1834, the heirs of Cloyes paid said Receiver $135 96¼ for the land in controversy, and other adjoining lands specified in the original bill, and received his receipt and certificate of purchase therefor, numbered 663. That, on the same day, the Register made his corresponding entry upon the tract book as made upon certificate no. 663; and, also, noted said entry upon the plats of said land then on file in the Land Office, by marking down in the margin of each of said fractions in red ink, the corresponding number 663; and thereupon he issued to said heirs a patent certificate endorsed as directed aforesaid, for all of said lands. All of which facts, they aver, existed at the time of the filing of the original bill, but were then wholly unknown to

the complainants or were imperfectly known, and had been defectively stated by them. But which matters, they charge, were, in law, constructive notice to all purchasers under the alleged void patent issued upon the locations of Gov. Pope. And they pray that James B. Johnson, and Mary W., his wife, may be made parties defendants, and for relief as before.

The complainants' bills were decreed as confessed against Richard C. Byrd, William J. Byrd, Jacob Mitchell, Henry F. Pendleton, Thomas S. Reynolds, Alexander George, William W. Daniel and John Morrison and Edney his wife. And the executrix and heirs of Chester Ashley, deceased, having filed a disclaimer, the bill was dismissed as to them. All the other defendants answered, upon which issues were formed.

These answers admit the making of the proof at the Batesville Land Office in 1831, and the allowance of the pre-emption claim to the fraction in controversy in that office, the 28th of May 1831, but deny that the claim was a fair and valid one; and aver that Cloyes, the alleged pre-emptor, was not entitled to the same under the act of Congress of the 29th of May, 1830, and the supplemental act of the 14th of July, 1832. That it was proven up by false testimony. That no tender was ever made at the Batesville Land Office, and none at the Little Rock Land Office, until the 5th of March, 1834, when the entry was made under the special instructions of the Commissioner of the General Land Office. That, at that time, the official plats of survey were not at the Land Office at Little Rock, and were not received there, regularly, until 11th day of April following; that the entry was therefore invalid. In a word, these defendants insist that the claim of Cloyes was a gross fraud on the law, and was fraudulent in fact, and that the allowance of it was null and void. They also admit by their answers that Governor Pope, under whom they claim, selected the land in controversy, in pursuance of the two acts of Congress of the 15th June, 1832, and 2d March, 1833, but deny that he did so illegally or by mistate. They also set up in their

answers the statute of limitations and the staleness and fraudulent character of the claim, and lapse of time.

The residue of the case material to be stated, may be presented in the language of the Chancellor, *to wit:*

" The defendants, Elias N. Conway, Woodruff, Watkins and Bertrand, admit notice of the claim; protesting that, with the communication of notice, assurance was always given of its fraudulent and iniquitous character, and they had supposed it to have been long ago abandoned, and that it had for years ceased to be the subject of conversation, or apprehension, till about the commencement of this suit.

" The other defendants, except the *pendente lite* purchasers, and the Trustees of the Real Estate Bank, claimed the protection of the court as purchasers in good faith, for valuable consideration, without notice of the complainants' claim, or of any incumbrance whatever. The Trustees of the Real Estate Bank did the same, except so far as they might be affected by the possible individual notice of some of the Directors of the Bank at the time of their purchase. All the defendants complain that by the delay in the assertion of this claim, and its consequent supposed abandonment, they, and those under whom they hold, have been lulled into security, so as to have made permanent, costly and valuable improvements, while the complainants by themselves, or their agents and attorneys, were consenting to, and conniving at such improvements and expenditures. They maintain that the complainants are estopped from now asserting their claim; or, if not, so far affected, that if the claim be adjudged good they ought to have pay for their improvements, and ask it on principles of equity, and upon a territorial statute of improvements and title. Other defences are set up in some answers, perhaps in all. The foregoing epitome likely embraces most of the causes of defence, that seem to be relied on as substantial.

"The defendant, Bertrand, made his answer a cross-bill, in which he charges that Ben Desha was entitled to one-half of

Cloyes pre-emption right, by deed and contract made to that effect before the claim was proven at Batesvllle; that he is dead, and has heirs; that William Cummins, by contract with, and conveyance from Desha, obtained right and title to the one-half of Desha's interest ; that he is dead, has an heir; that he bought and took conveyance of part of the land in controversy from Cummins, and that if the claim be good, Cummins's one-fourth ought to be set-off, so as to include that property and save him, Bertrand, harmless, so far; and he makes the heirs of Desha and Cummins parties, and propounds interrogatories to them and the complainants in the amended bills."

This cross-bill was taken as confessed as against some of the defendants, and the others answered it; upon which latter issues were formed, but in the view we have taken of the case made, it will be unnecessary to state the purport of these answers.

On the 4th of September, 1855, the Chancellor, having fully heard the cause, dismissed the original, amended and supplemental bills of the complainants below, and also the cross-bill of Bertrand.

The complainants below as well as Bertrand, appealed to this. court; but the appeal of the latter has not been prosecuted here.

The first point, mooted upon the opening of this record, was, as to the true attitude of the cause; and having considered that preliminary question, we doubt not that, for most practical purposes, it is substantially a new case. Not that the decision of the Supreme Court at Washington, when this cause was there, is not the law of the case in the ordinary legal sense of that phrase——on the contrary, it is in virtue of so much of that decision as allowed the respective parties to amend their pleadings, "that the merits of the case may be fully presented and proved as equity may require," that the case has been so transformed as to give rise to the question mooted—but that having been thus metamorphosed, there is now but little margin for any further application of the matters decided on the former aspect of the case, to any question arising in its present attitude.

And this transformation has been effected as well by the complainants as by the defendants. They, since this was cause remanded to the Chancery Court below, have twice amended their original bill, to present more fully the merits of their case, and have introduced upon the record a new complainant, together with divers new defendants. Thus, presenting new facts, which, in connection with those already alleged, have elicited new defences, whereby, not only the range of investigation has been enlarged, but questions have sprung up materially different from those which arose upon the case originally made and decided.

Hence, although the exposition of the laws under which these complainants claim the land in controversy, as given by the Supreme Court at Washington, when this cause was before that court, is not to be departed from in the decision of the various questions which arise in the case now made by the pleadings and evidence, nevertheless this cause is now to be determined as well in reference to known equity law as to those expositions.

It is the complainants who have brought this alleged pre-emption right into the Chancery Court, asking that it may be recognized as valid, and that it be adjudicated a better claim to the land in controversy than that under which the defendants hold under the highest grade of title from the General Government, under whom both parties claim. The defendants have not come here asking for relief, but having been brought here, they deny the alleged equity of the complainants, and assail it, in divers ways, for illegality, fraud and unfairness. When thus met by charges so serious, if the complainant's alleged equity could not be subjected to scrutiny, the Chancellor might become an instrument for the establishment of fraud. His favorite avocation, on the contrary is its suppression. Hence, even without any special regard for the interest of the defendants, he demands that suitors shall come "with clean hands." And he does this, although infants and *femes covert* may be the parties complainant; because, although the "party, who is to receive the benefit, may have been no party to the fraud," and may be ever so chaste, yet, if it comes

through a polluted channel, it is tainted and infected by fraud, and cannot be upheld. Infancy and coverture furnish no excuse for fraud, and are no protection from relief sought against it. 1 *Fondb. Eq.* 71, 152; *Sug.* 522; 1 *Wash. Rep.* 299; *Marbury vs. Bank,* 11 *Wheat.*

Although, then, the complainants in this cause present themselves with a patent certificate for the land in controversy, which, in a court of law, under our statute, would be received for its apparent value without special regard to its antecedents (*Gaines et al. vs. Hale,* 16 *Ark. Rep., p.* 9,) or the purposes for which it may have been issued, beyond what might appear upon its face, yet, when the claim predicated upon it should be opposed upon the grounds already stated, a Court of Chancery, even for its own protection, might properly look to both, when the objections taken are so strongly sustained by the testimony as in this case.

It appears by documentary testimony in the cause, that after it had been finally determined by the Treasury Department, that the patent should be issued to Governor Pope, for the land in controversy, under the 1000 acre grant to the Territory of Arkansas, the Secretary "feeling unwilling to prejudice any claim" of the heirs of Cloyes to this land under the pre-emption laws, and "that they might be more effectually enabled to maintain their rights before the proper judicial tribunal, concluded to give them the option of completing their payments, or withdrawing them in case payments had been made, as they might elect," "although the department was averse to the issuing of patents to them for the same lands," and requesting that the land officers might be instructed accordingly. (See *Secy. Taney's Communication to Comr. of General Land Office, October 31st.,* 1833, 2d vol. *Ins. & Opns., Pub. Lands, p.* 572, copied in the transcript.) The Register of the Land Office at Little Rock, having been instructed accordingly by the Commissioner, who directed, also, that in case the parties should elect to make the payment, the Register should, in addition to the ordinary entry upon his books, note

51c

the fact of the interference with Gov. Pope's location and refer to the Secretary's decision, and that similar entries were to be made upon the Receiver's receipt, and the certificate of purchase, and also instructed him that a patent was not to be issued for the land.

Under these instructions payment was made, and the alleged patent certificate issued the 5th day of March, 1834.

Although there is some evidence in the record, that at this time the official plats of survey were in the Land Office at Little Rock, nevertheless, the evidence to the contrary, from the Office of the Surveyor General of Arkansas, and elsewhere, is so entirely satisfactory, that we feel bound to hold, as we do, that such was not the fact; on the contrary, that these official plats were not regularly in the Little Rock Land Office until on or about the 11th of April following. This discrepancy may, perhaps, be accounted for by the fact, that the Office of the Survey General for Arkansas was at Little Rock, and the Land Officers might thus have had access to the plats while in his office; or might have been permitted, informally, to take them to their own, in advance of the time when the Surveyor General might have been prepared to give them his official sanction, in transmitting them regularly to their office, as he seems to have done on the 11th of April, 1834.

Under this state of facts the payment of the money on behalf of the heirs of Cloyes, on the 5th March, 1834, cannot be regarded as a legal payment for the land, although sanctioned by instructions from the Commissioner under directions of the Secretary of the Treasury. According to what we understand to be settled law, and the uniform practice of the Government, public lands are not subjected to sale at all, until the plats of survey are regularly in the District Land Office in which they are situated. Before the public surveys are completed; and the final act connected with this process is the official transmission of the plats of survey from the Office of the Surveyor General to the General Land Office, and the District Land Office in which the land is situate;

the law, as we understand it, does not authorize the sale of public lands by the Government, or any of its agents. Under the pre-emption law "proof of settlement and improvement" was to be made to the satisfaction of the Register and Receiver, "agreeably to rules to be prescribed by the Commissioner of the General Land Office for that purpose." And as held by the Supreme Court at Washington in this case (9 *How. Rep.*, *p.* 332,) as to the point of defective proof in the case, as tested by the general rules prescribed by the Commissioner: " Having power to impose this regulation, the Commissioner had the power to dispense with it for reasons which might be satisfactory to him:" But there was no such power of dispensation with the law prohibiting the sale of the public lands previous to their survey, given by that act, either to the Commissioner or to the Secretary.

It is to be inferred from the documentary testimony in this cause, certified from the Department at Washington, that both the Secretary and the Commissioner had the impression that the official plats were then already in the Land Office at Little Rock, or else took it for granted that the Register and Receiver would not act under the instructions given them until that should be the case. It appears, however, that, either from misapprehension or haste, the payment was in fact prematurely made. And the legal consequence is, as we have already said, it cannot be regarded as such, although it may be taken as a tender persisted in.

The complainants' case, then, must be considered as resting for support upon the alleged cultivation and occupancy adjudicated as sufficient by the Register and Receiver at Batesville, the 28th of May, 1831, upon the evidence adduced before them taken in the regular mode (irregularities in the mode of taking, having been adjudged to have been waived, 9 *How. Rep.* 322,) and a legal tender of the money in March, 1834; because there is no sufficient evidence in the record to induce us to believe that there was any formal tender of the money previous to that time.

It is insisted that this latter is, of itself, a fatal objection to the complainants' case.

We have not been able to take that view of this objection, in the light of the points actually decided by the Supreme Court at Washington, in this case, in connection with the foundation upon which the opinion then delivered manifestly rests, and the reasoning employed to sustain the judgment of that court. 9 *How. Rep.* 328, *et seq.*

Clearly, it was held that the occupancy and cultivation, together with the adjudication of its sufficiency by the land officers, upon proof adduced to them, and a tender of the money, the two latter within the life of the law—so was the averment in the bill admitted by the demurrer—gave to Cloyes a right to the land in controversy, superior to that of the grantees of the government. And this, although it distinctly appeared in the bill, thus admitted to be true, that the surveys had not been made and the plats returned before the law expired. This, then, necessarily overthrows the ingenious position—taken upon the assumption that the act of 1830 applied only to land actually surveyed, and the plats thereof returned within the life of the law— that a pre-emption right, being a right to purchase in preference to another, is the minor: and the right to purchese, the major: and that hence, if there was no right to purchase at all, there could be no pre-emption right; because this is an express adjudication that the act of 1830 did apply to unsurveyed lands: for such the land in controversy emphatically appeared to be. Cloyes, in his original application exhibited with his bill, referred to the the County Surveyor of the Territory for quantity of the tracts applied for, and not to surveys of the Federal Government; and, besides, it otherwise appears in the bill that the surveys were not completed and the plats returned until some three years afterwards.

It is in reference, then, to unsurveyed land that the language of the court, in the opinion delivered, is to be construed, for such was the case before it.

In reference to the grant by Congress, under which the defendants claim, the court say: "Before the grant was made by Con-

gress of this tract of land, the right of Cloyes to a pre-emption had not only accrued under the provisions of the act of 1830, but he had proved his right to the satisfaction of the Register and Receiver of the Land Office." From which it is to be distinctly inferred, that neither proof nor payment was considered to be a pre-requisite of the accrual of the right.

And this is affirmed again in the more recent case of *Bernard et al. vs. Ashley et al.*, 18 *How. Rep.* 43, where the court, referring to Lytle's case, and speaking of Cloyes' claim, say: "This court holding his claim to the land to have been a legal right by virtue of the occupancy and cultivation."

This right, thus springing up under the act of 1830, the court proceeds to hold, (as we understand the opinion delivered,) is in no way revived or created anew by the act of the 14th July, 1832: but that act, simply recognizing it as a subsisting legal one, already vested in the settler, provides the means by which it may be perfected. This is to be inferred from the observations of the court, as to the question mooted touching the supposed necessity for new proof, which are, that "the proof of the pre-emption right of Cloyes having been entirely satisfactory to the land officers, under the act of 1830, there was no necessity of opening the case and receiving additional proof under the subsequent laws. The act of 1830 having expired, all rights under it were saved by the subsequent acts. Under these acts, Cloyes was only required to do what was necessary to perfect his right. But those steps within the law, which had been taken, were not required to be taken again." Also from the additional observation, in connection with the declared effect of the act of 1830, to appropriate the land to the settler for one year, so that, during that time, it was not subject to any other claim, that "the supplemental act, approved the 14th July, 1832, extended the benefits of the act of 1830." And more especially from an examination of the opinion delivered on the part of the dissenting judges, as compared with the opinion, wherein it is manifest that it was, as to this construction, the main point of difference arose—the

dissenting judges maintaining that "the act of 1830, was made a part of the act of the 14th July, 1832; they stood as one act, and took date on the 14th July;" and the majority, the contrary.

In one respect, however, the 2d section of the act of July, 1832, seems to have been considered by the whole court as conferring new rights, and that is as to the privilege of entering adjoining fractions. Hence, as it appears in the dissenting opinion, the court were unanimous, that an entry could not have been allowed for more land than the fraction occupied, without new proof, under any circumstances; and in this case, could not be allowed at all; because the rights of the grantees of the government had intervened as to these new rights before the passage of the law creating them.

Nor was the prospective feature of the act—necessarily prospective to be of general efficiency in reference to the future progress and completion of the public surveys of lands already cultivated and occupied during the period fixed by the act of 1830—to be taken as conferring any new right.

And the same remark is applicable to the remaining new feature, that is, its want of conformity to the act of 1830, in having no day fixed for its expiration, other than that fixed for the forfeiture of each right in succession already vested under the act of 1830, if not proved up and paid out, or tendered for, within the time fixed by the act, after the return of the official surveys, which include the land claimed. Because both features had exclusive reference to the rights that had already accrued under the act of 1830.

In this view of the law, although a tender within the life of the act of 1830, in addition to the proof adduced before the Register and Receiver, might have shown the utmost diligence in presenting the claim, it is not easy to see that a failure to make it was negligence, much less, strong evidence of abandonment.

It is true that the Commissioner instructed all Registers and Receivers, in reference to the act of 1830, that that act contem-

plated payment at the time when the claim might be adjudicated by them in favor of the pre-emptor. But this was upon the hypothesis that the surveys had been completed and the plats returned, and the government, consequently, in a condition to sell the lands. And, besides, this was at a time when the law was, almost universally, understood to apply to none but the surveyed lands of the government; and its equity—if it had any, which was not then clear—of doubtful application to land actually in process of survey. And it is to be borne in mind, also, that this was but a construction of the law made by the commissioner for his own guidance, who had no power given him by the act to construe it, although he had ample power to prescribe rules touching the proof of pre-emption. And this was in harmony, too, with the idea—then as universally understood—of the "shadowy" nature of the right, which no one then supposed could be recognized by the courts, after the expiration of the law, as having a legal existence at all, unless perfected, either in fact or in law, by every imaginable effort within due season, and that was not supposed to be beyond the life of the law.

This was no unreasonable construction, under such an understanding as to the extent of the application of the law, and of the nature of the right it created. Because, if the law applied to none but the surveyed lands, the pre-requisite acts to secure the perfection of the right were practicable, and it implied negligence if they were not performed or offered to be performed. And if the right was not "shadowy" and unsubstantial, having a purely legal existence of the most precarious character, and destitute of merit, so far as the claimant was concerned—being a gratuity to trespassers on the part of the government—it was not unreasonable to apply to it the most rigid rules of construction.

. But when it has come to be declared by the proper court of the Federal Government, that the law applied as well to the unsurveyed as to the surveyed lands, otherwise liable to be claimed :

and that " the pre-emption claim is not that shadowy right which by some it is understood to be; " and that " when covered by the law, it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it," and that this right springs up " in virtue of the occupancy and possession "— as right springs upon payment of the consideration, although inadequate, we suppose—and that the law itself denounces a forfeiture in terms, only in case of a failure to make " the proof and payment required before the day appointed for the commencement of the sales of lands, including the tract or tracts on which the right of pre-emption is claimed," (4th sec., Act of 29th May, 1830,) it would seem unreasonable and improbable that Congress should have designed, as to the unsurveyed lands, that payment should have been tendered previous to the time when, by law, it might be received by the agents of the government; and equally harsh and rigid for the courts, upon such a construction of law—now supposed to have both soul and spirit, as well as body and form— to denounce a forfeiture on account of the failure to make such a premature offer of performance.

Regarding, then, the points of law decided in the case at bar, by the Supreme Court at Washington, and their legal sequences, as of binding authority in its further progress, and so understanding them, we must necessarily overrule the objection urged as to the tender, and hold it good, because it is to be considered as having been made within the twelve months allowed by the act of the 14th July, 1832, after the return of the plats of survey.

" When more is done than ought to be done, that seems to be done which was to be done; so that, if a man tender more money than he ought to pay, it is good enough: for every greater contains the less: and the other ought to accept so much of it as is due to him.  See 5 Coke, 11.

In taking the complainants' case as resting for support upon the grounds we have stated, we have assumed, that the adjudication of the Register and Receiver, made in favor of Cloyes, the 28th May, 1831, was valid.  But we have done so with doubt

as to the legality of that procedure, occurring, as it did, in advance of the public surveys; and, consequently, at a time when it was impossible, in the nature of things, for those officers to determine, with absolute certainty, that the proof they allowed as sufficient to establish the requisite cultivation and occupancy, was applicable to the particular tract of land in controversy. Nor do the instructions of the Commissioner, under which this procedure was had, remove this doubt, because his power, given by the act of Congress, to prescribe rules, would seem to presuppose a subject within the jurisdiction of the Register and Receiver, as their own authority to act in accordance with such prescribed rules, would seem to do also. Nor does the recognition of the validity of the adjudication, by the subsequent acts of the Secretary, come up to the point of difficulty, unless it be supposed, which is not impossible—inasmuch as no time was specified by the act of Congress, within the life of the claim, for the making the adjudication thereon—that the surveys were but the means of identity of the land claimed, which they already had within their jurisdiction under the law; and, consequently, that if, in fact, that identity was truly ascertained otherwise than by the surveys, the adjudication, although prematurely made, was within their powers, because the subject was within their jurisdiction.

### AS TO LAPSE OF TIME AND STATUTE OF LIMITATIONS.

But thus considering the complainants' case to rest, their equity arising thereupon, must, of course, prevail; unless their remedy has been barred, or unless the equity of the defendants, upon comparison with theirs, be found superior, either in itself, or by reason that the fraud alleged shall be found upon the testimony in the cause.

We concur with the Chancellor in his opinion, that upon the facts and circumstances of this case, the complainants ought not to be barred of remedy, irrespective of the disabilities upon them

52c

at the time their rights matured sufficiently to authorize them to apply to a court of equity for relief; but have not been able to concur with him—and on the contrary take a different view—as to the effect of these disabilities upon the parties in this cause.

This contrariety, however, arises mainly from an interpretation of the proviso in our statute of limitations, which we shall adopt as the true one, and which seems to be different from that apparently given to it by the Chancellor; but is also the result of different views as to the character of the complainants' rights. It is fair, however, to the Chancellor to say, as appears in his opinion delivered in the cause, that upon this point, it was "not a decided one," and that he gave the complainants the benefit of his doubts, as he expressly says.

It is certainly true, that in several of the States, it has been held, and the doctrine applied in quite a number of cases, that when all the parties in interest labor under disabilities at the time when their right of action accrues to them, the statute does not begin to run against any of them until a fixed time after such disabilities shall have been removed as to all of them. And also the converse, that is to say, if one or more of them be not under disability at the time when the right of action accrues to them, it shall run at once against all of them, notwithstanding the others may then be under disability.

But, upon an examination of the authorities, we have found in the cases which seem to give the initial to these doctrines, and wherein reasons are given for their support, that they are founded upon the particular phraseology of the respective statutes, which are taken to indicate their true meaning and intent. Thus, in the case of *James Dickey vs. Armstrong's Devisees*, (1 *A. K. Marsh. Rep.* 40,) upon the Kentucky statute—wherein, after the enacting clause, it is provided "that if any person or persons entitled to such writ, &c., shall be under the age of twenty-one," &c.—and where the parties complainant were held by the court to have taken by devise a joint estate, and not an estate in com-

mon—as all inheritances in Arkansas are declared to be by our statute of Descents and Distributions, (*Digest*, *chap.* 56, *sec.* 14,)— the Kentucky court proceeds to say, by Mr. Chief Justice Boyle: "The opinion of the court below seems to have been predicated upon the idea that the absence of one of the lessors of the plaintiff from the commonwealth, brought him within this clause, notwithstanding the other lessors of the plaintiff did not appear to be within any of the exceptions it contains. This idea would have been correct, no doubt, if the devise to the lessors of the plaintiff had been of an estate in severalty or in common; for in either of these cases, their right or title would have been several, and each of them might have maintained his several action. But as the devise is admitted to have been made to them in general terms, without any modification or restriction, we must assume the estate they took in the land, to be a joint one; and, consequently, that their right and title are joint. It would seem, therefore, that to bring any one of the lessors of the plaintiff within the influence of the clause before recited, the others must also be shown to be within some of the exceptions it contains. For the right to bring an action, or make an entry, after the expiration of twenty years, is granted only upon the condition that the person or persons entitled to such action, or to such right of entry, shall labor under some of the disabilities mentioned; that is, if any person is entitled, where there is but one, having a separate right or title; or if any persons entitled, where there is a plurality of persons having the title, be within some of the exceptions mentioned, in such case, and not otherwise, is the right of action or right of entry saved. The expression, if "any person or persons entitled," &c., were or shall be under the age of twenty-one years," &c., is, in point of grammatical propriety, susceptible of no other construction. Besides, upon any other construction, the term "persons," in the plural, after the expression "any person," in the singular number had been used, would be nugatory and inoperative: and it is a rule in the construction of a statute, that it shall be so expounded, that not

only every clause, but every word, shall have some operation and effect. In fortification of this construction, we may remark, that the saving in the statute, in relation to personal actions, is couched in similar language, and that the Supreme Court in the case of *Marsteller et al. vs. McClean et al.*, 7 *Cranch Rep.* 156, has given to it the same exposition which we have to the clause under consideration."

So, also, in the case of *Perry vs. Jackson*, 4 *Term Rep.* 516, upon the proper construction of the saving clause in the statute of James—which was the only case cited by Judge STORY, in the decision of the case cited from 7*th Cranch*, by the Kentucky court—Lord KENYON seems to base his judgment upon a like grammatical foundation. That was a case of co-partners; two of whom had always remained in England, and the other was in America when the action accrued, and until within six years before suit brought. His Lordship said: "Now the words of this clause, grammatically speaking, do not apply to the present case: they only extend to cases where the person, individually, a single plaintiff, or persons, in the plural, where there are several plaintiffs, are not in a situation to protect their interests."

The North Carolina court, in the case of *Ridon vs. Frion*, 3 *Murph. Rep.* 579, upon the proviso of their statute, citing the cases in 7*th Cranch* and 4*th Term* as authority, harp on the same string, and conclude that "the words of the proviso, relate only to the case where all the plaintiffs are under disability—'that if any person or persons,' &c., mean where either a single plaintiff, or several plaintiffs are under some of the incapacities provided for.

And it is upon like grounds of reasoning, that the Tennessee court proceeds in the case of *Shute vs. Wade*, 5 *Yerg. Rep.* 1, in a very elaborate argument, upon the proviso in the statute of that State, which hinges all throughout on the plural, "they" and "theirs:" in which, upon review of the cases of *Perry vs. Jackson*, *Marsteller vs. McClean*, and *Ridon vs. Frion*, they approve the former, as held, in reference to its facts, "upon the clearest

reason," and pronounce against the two latter in the application of the law legitimately evolved by the reasoning employed, *to wit:* the grammatical chain.

In the mean time the subject had been brought to the notice of Chief Justice MARSHALL, in the case of *Doe, dem. of Lewis et al. vs. Barksdale,* 2 *Brock. C. C. Rep.* 437, upon the proviso in the Virginia statute, which does not employ quite so many plural terms in its phraseology as some others, but does employ as many as the proviso of the Kentucky statute, both being precisely the same in phraseology, upon which the Chief Justice made the following remarks: "If this were an original question, I should feel much difficulty in so construing the first and second sections of our statute of limitations, as to exclude one co-heir from the exception in his favor, in consequence of the omission of another to assert his right within the time to which it is limited. The proviso of the act appears to me to be in favor of each individual who comes within it. It is personal. It applies to him who labors under the disability. It is made in consequence of that disability: and it seems to me that the intention of the act would be defeated by a construction, which denies the benefit of the saving to an individual coming within its words, or would give that benefit to an individual not coming within them."

But in the construction of the savings of our own statute, in connection with its enacting clause, we are not left to choose between the authorities above presented, and those which follow them upon the one side, and those sound common sense views of the Chief Justice upon the other side: because, our Legislature, as if designing still further to disinfect the rights of those under disability, from the malaria of mere verbal criticism and grammatical interpretation, has, as far as practicable, in the phraseology of our act, eschewed the plural, and enacted the singular.

The savings are contained in the 4th and 5th sections of the act. *Digest,* chap. 99, *p.* 695, 696. The latter relating to the happening of the death of a party under disability during its

654 CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY

continuance, and providing that suit may be brought or entry made within five years after such death, and the former is in the following words *to wit :*

" If any person entitled to commence any action in the preceding sections specified, or to make an entry, be, at the time such title shall first descend or accrue—1st, within the age of twenty-one years: second, insane: or third, a married woman, the time during which such disabilities shall continue shall not be deemed any portion of the time in this act limited for the commencement of such suit, or the making such entry; but such person may bring such action, or make such entry after the time so limited, and within five years after such disability is removed, but not after that period."

It seems to us that the intention of the Legislature is very lucidly and distinctly expressed. According to settled law, if, after the enacting clause, this saving clause had not been inserted, all persons, as well minors, married women and insane persons, would have been barred by the lapse of time prescribed. Who then are saved by this proviso? The statute answers, "any person who, at the time such title shall descend or accrue," was a minor, *feme covert,* or insane. Are any others saved? A well settled rule of construction excludes all others from the saving. To what extent are the persons embraced, saved? The statute answers, in what we think is its clear meaning, that each of them, severally, must take the benefit of the saving within five years next after arriving at age, or after discoverture, or after coming of sound mind, and not after that five years. In a word, it is manifest to us that it was the clear intent of the Legislature to save minors, married women and insane persons, and no other person than these, either by direct or indirect means. And, therefore, in the language of Judge MARSHALL, above copied, the intention of the act would be defeated by a construction which denies the benefit of the saving to an individual coming within its words, or would give that benefit to an individual not coming within them.

But the Chancellor seems also to have admitted the correctness of the proposition strenuously contended for by the counsel for some of the defendants, that the right, interest and estate of the complainants were so inseparably joint and consolidated, that no remedy could be sought by them, otherwise than by a joint suit, either in law or equity; and that, in such cases, according to the forms of pleading, all must recover or none. If so, this was an entire mistake as to the first branch of the proposition; and the second, even in courts of law, is now admitted with many exceptions, which greatly modify the rule as it was originally enforced in England, as may be seen by the cases, English and American, cited and examined by this court in the case of *Ferguson et al. vs. The State Bank*, 6 *Eng. Rep.* 516, 517, where it was held, in a suit upon a joint contract, that a successful plea of *non est factum* would not enure to the benefit of a co-defendant, and it was conceded, also, that a plea of the statute of limitations would not, although jointly pleaded, if the issue were found in favor of one defendant and against the other, but that the plaintiff could take judgment against the unsuccessful defendant, and the successful one would be entitled to a judgment of discharge, and for his costs against the plaintiff.

As to the first branch of the proposition: so far from the interest of the heirs of Cloyes—a mere equitable one founded upon the legal rights of their father, which they have endeavored to perfect—being "an estate in joint tenancy, which can only arise by purchase or grant: that is, by the act of the parties, and never by the mere act of the law," (1 *Lomax' Digest—Law of Real Property, chap.* 15, *sec.* 3, *p.* 472,) it is certainly to be considered under the provisions of our statute as but a tenancy in common, whatever might have been its common law nature. Because, if considered as derived by inheritance from their father, our statute (*Des. & Dis., chap.* 56, *sec.* 14, *p,* 438,) enacts that "they shall inherit as tenants in common." It is true it is elsewhere enacted in the same act (*Ib. sec.* 1,) that real estates of ininheritance "shall descend in parceny to his kindred," &c., but

656      CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.      [JANUARY

this, in that connection, had more especial reference to the common law, *jus representationis*, and is to be considered as controlled by the subsequent express provision as to the nature of the tenure of the estate inherited—a tenancy in common. And if, on the other hand, it be considered as derived by their own purchase from the general government, under the certificate of purchase issued to them by direction of the Secretary of the Treasury, to enable them more effectually to present their alleged rights in the courts of justice, the result will be the same, within the spirit and intent of our statute forever abolishing survivorship in real and personal estates; (*Digest, chap.* 92, *sec.* 6, *p.* 621:) and that other provision enacting that "every interest in real estate granted or devised to two or more persons, (other than executors or trustees as such,) shall be a tenancy in common, unless expressly declared, in such grant or devise, to be a joint tenancy." *Digest, chap.* 37, *sec.* 9, *p.* 265.

Having thus ascertained the nature of the complainants' tenure, we proceed to remark, that so far from its having been necessary for tenants in common to adopt a joint action, at the common law, they were not allowed to recover at all in ejectment on a joint demise. The general rule is well enough stated for our purpose, in quite brief terms, in the case of *Moore et al. vs. Armstrong*, 10 *Ohio Rep.*, at *page* 15, 16. The court say: "The rule with regard to the form of declaration, when joint tenants, co-parceners and tenants in common sue, is sometimes thus expressed; that the two former being seized, *per my et per tout*, derived by one and the same title, and having a joint possession, must join in the action, and that tenants in common, having several and distinct titles and estates independent of each other, must count upon separate demises. *Boner vs. Juner, Ld. Raym.* 726; *Morris vs. Barry*, 1 *Wilson Rep.* 1; *Heatherly vs. Western*, 2 *Wilson Rep.* 232. But we have seen that in *Roe vs. Rowlston*, and in *Doe vs. Barksdale*, the demises were separate, and were from co-parceners, and them we held to be the only ones on which they could recover. Perhaps, however, it would

be more correct to say, that joint tenants must join; co-parceners may either join or sever, (1 *John. Cas.* 231, *Jackson vs. Semple ;*) and tenants in common (independent of the statute of Ohio, which authorizes them to join,) must sever."

It seems, also, that by special statute, tenants in common may join in Vermont, (*McFarland ad. vs. Stone,* 17 *Verm. Rep.* 175.) In Tennessee, a practice to that effect has grown up, as appears by a remark of Judge CATRON, in the case of *Burrow's Lessee vs. None,* 2 *Yerg. Rep.* 228, where he says: " In this State, the uniform practice has been, for tenants in common in ejectment, to declare as on a joint demise, and recover a part, or the whole of the premises declared for, according to the evidence of title adduced."

In this State, the only provisions of our statute, which would seem to have any bearing on the subject, are those in the statute of ejectment, (*Digest, chap.* 60,) in one of which, (*sec.* 4,) it is enacted that: "the action of ejectment shall be brought and prosecuted in the real names of the parties thereto:" by which, no doubt, the fictitious lease, entry and ouster of the common law are abolished. And in the other, (*sec.* 8,) it is enacted that: "The defendant may plead the general issue, &c., and all pleadings and proceedings in the action shall be conducted as in personal actions, except when it is otherwise prescribed."

This legislation must be construed in reference to the old law, and the supposed mischief, and the remedy. By the old law, although tenants in common had several and distinct titles and estates, independent of each other, they could, by several fictitious demises to a fictitious lessee, so unite their interest as to supersede the necessity of several suits, and enable the party, by means of this fictitious lessee, to recover the whole or less, or a proportion of the land sued for, according to the titles of the several lessors; that is to say, if the suit was for one hundred acres of land, the recovery could be for a less quantity; so if the suit was for an undivided half, the verdict and judgment might be for a less portion. 1 *Burr.* 326. The reason was, that the

53c

658          CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.          [JANUARY]

action, being fictitious, was moulded to effect the purposes of justice; and it was but just that one should recover provided any, under whom he claimed, had a good title either to the whole or a portion of the land sued for; and that his recovery should be in proportion to that good title. It is evident from the provision, that the suit is now to be brought in the name of the real parties plaintiff, and from what they are to allege and prove, that the Legislature designed only to abolish the fictitious portions of the suit, and to retain the substantial ones, and make these more subservient to justice. If this be so, it cannot be supposed that tenants in common are now to be driven to several actions, or that if they join in one action, that action is any further a joint action, technically, than it was before, and this was so or not, according as it may have been upon a joint, or upon several demises.

Hence, if the action be brought by tenants in common, it must be considered, as it would have been originally, as on several demises; because tenants in common could only have declared and recovered in that way; and, consequently, the recovery must be according to their several titles, and if some be barred by the statute of limitations, and the others not, the latter may still recover their proportion.

And such seems clearly the idea of the Supreme Court of Vermont, in which State, by special statute, tenants in common are allowed to join, as appears by the following remarks, in the case of *McFarland vs. Stone*, 17 *Verm. Rep.* 175, where all joined in an action of ejectment, and all but two were barred by the statute of limitations. The court say: "As this is not a case of joint tenancy—in which all must join in bringing suit—the rights of some may be barred, and not those of others—as some might have conveyed their interest by deed, or be barred by estoppel—so; also, by the statute of limitations. One tenant in common may recover the whole estate against a stranger; and in Vermont, tenants in common may join by special statute; but it has never been held that the right of one tenant in common being

OF THE STATE OF ARKANSAS. 659

TERM, 1857.] Lytle et al. (Cloyes' Heirs) vs. The State et al.

barred by the statute of limitations, the rights of all were gone, notwithstanding they were under disabilities—and such a doctrine would be strict and unreasonable." *Hicks vs. Hoges*, 4 *Cranch* 165; 1 *Ch. Pl.* 56.

In the case of *Doe dem. Lewis et al. vs. Barksdale*, 4 *Brock.* 444, which was ejectment by co-parceners, in which both joint and several demises were laid in the declaration, Chief Justice MARSHALL concludes the opinion of the court as follows: "The counsel for the defendant contends that the lessors of the plaintiff constitute but one heir, and that as one of them is barred by the act of limitations, all are barred. As one of them cannot be brought within the saving of the act, those who do come within it cannot avail themselves of. the exceptions in their favor. It has already been said that this construction would defeat the obvious intention of the act. A person whose right is expressly saved for his own benefit, would be deprived of that right by the negligence of another, over whom he has no control. One of the co-parceners might have been of full age when the cause of action accrued, so as to him the time would run from the entry of the defendant. The exception, then, in favor of the parties, in whose favor the exceptions are made, would be of no avail. According to the principles maintained by the defendant, as they are understood, no partition could be made by the co-parceners while out of possession. Their deeds are mere nullities under the act prohibiting conveyances of pretended titles. This construction would certainly defeat the intention of the law. If it could be sustained, the separate demises laid in the declaration would be erroneous, for one joint demise only could be sustained. But although the title be joint, the interest is, to every intent and purpose, several and does not survive. In reason, then, it would seem that each co-parcener might recover his separate interest. The case of *Roe dem. Langdon et al. vs. Rowlston*, 2 *Taunt. Rep.* 440, is the very case, and must be declared not to be law, on the principles for which the defendant contends. The cases cited from 4 *Term, Durn. & E., p.* 516, and 7 *Cranch* 156, are

660     CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

not applicable to this. They were decided, not upon the rights of the parties, but the forms of pleading. The parties pleaded jointly, and their plea was good or bad as a whole. The court must either have determined that a party not within the exception was brought within it by being joined with a person entitled to its benefits, or that a person really within it must lose its benefits by having joined in the plea with a person not entitled to the protection of the bar. The plea was not good as to the person who could not bring himself within the exception, and being bad in part, was on technical legal principles declared to be bad in the whole. But this technical rule does not apply to this case. The lessors of the plaintiff claim distinct rights under separate demises. Nothing in the form of the pleadings restrains the court from deciding according to the rights of the parties. The judgment, then, should be according to the legal rights of the parties; that the plaintiff recover six sevenths of the land in the declaration mentioned, and that judgment as to the seventh be entered for the defendant."

This legal technical rule touching the forms of pleading, of which the Chief Justice spoke, was the turning point in the case of *Moore et al. vs. Armstrong*, 10 *Ohio Rep.* 17, which was otherwise so ably considered by that court. There, the demise in the declaration was a joint one only, and on that unsubstantial ground that court felt constrained to decide contrary to the clear legal rights, as they distinctly admit, of some of the plaintiffs, who were not barred by the statute. The courts of Tennessee, however, long before, without the aid of any statute, had ceased to regard the character of the demise in any other light than as a part of the legal fictions of the action of ejectment, as is manifest from the remarks of Judge CATRON, before cited, that: "In this State the uniform practice has been, for tenants in common in ejectment to declare on a joint demise, and recover a part, or the whole of the premises declared for, according to the evidence adduced:" and the further remark of the same eminent Judge, in the same case, *to wit:* "Whether David and Alexander Bur-

row then had, or had not any title in the premises, was immaterial to Mrs. Crabb. She could recover as upon a separate demise; and proceeding upon the principle of disconnection between the tenants in common, the Burrows are barred, the same as if they had not joined with Mrs. Crabb. Such has been the uniform course of legal opinion in Tennessee, with Judges and Lawyers." *Barrow, Lessee vs. Nave*, 2 *Yerg. Rep.*, p. 228, 229.

On which we feel disposed to remark, that, in our opinion, no legal view could be more sound; because, when it is remembered that the whole action, in its origin, was fictitious, and was moulded expressly to effect the purposes of justice, nothing could be more consonant with the whole spirit of the scheme than to consider it so flexible as to admit of still further fictions, in an emergency, to subserve, more effectually, the purposes for which the whole was instituted.

But happily, in the State of Arkansas, in our several statutory provisions, as we understand their scope, spirit and meaning above indicated, the knife has gone so deep in extirpating the rotten, that courts of law can scarcely now be perplexed by this technical rule, so far as actions of ejectment may be concerned; much less ought courts of equity, in their anxiety to follow the law, be led to perpetrate injustice in its name, in analogous proceedings before them.

To conclude what we have to say upon this point of defence, we have to do but little more than apply the points of law concerning it, which we have determined, to the facts of the case before us.

At the death of Cloyes, the elder, he left four children, all of whom were then minors, *to wit:* Lydia Louisa, (who married Lytle,) born the 17th June, 1822, and who arrived at age the 16th June, 1843. 2d. Mary E., (who married Hooper,) born the 17th of April, 1824, and who arrived at age the 16th of April, 1845. She afterwards died in the month of September, 1850, and her children were made parties to the suit. 3d. Nathan H. Cloyes, born the 22d of June, 1826, and who arrived at age the

21st of June, 1847. 4th. William Thomas, born the 26th June, 1828, and died without issue in the year 1840.

And, supposing that no right arose to Cloyes, the elder, to resort to a court of equity in his life-time, but that such did arise to his heirs, in April, 1834; and assuming, also, for the present—which we shall more particularly notice hereafter—the requisite adversary possession of the defendants, the result is, that the statute began to run against the first named heir in June, 1843, upon her five years privilege, and run out in June, 1848: against the second named, upon hers, in June, 1845, and run out in June, 1850, as to her and those claiming under her: against the third, in June, 1847, and run out in June, 1852; and against those claiming under the fourth, at the time of his death, in 1840, and run out in 1845.

The original bill having been filed in 1843, was in time to charge all the defendants therein, except Bertrand, as to whom it was dismissed in July, 1844, he having been previously served with process, as is to be seen in the transcript; and no new suit was commenced against him within one year thereafter, so as to affect him by the savings of our statute in such cases provided.

The filing of the amended bill, the 17th of January, 1851, is to be taken and considered as the commencement of the suit as against the new defendants therein, and the statute of limitation will avail them at that period. *Miller vs. McIntyre,* 6 *Peters Rep.* 61; *Alexander et al. vs. Pendleton,* 8 *Cranch Rep.* 470. At that time, all remedy was barred as against these new defendants—some nine or more in number—except on the part of the one-fourth interest of Nathan H. Cloyes: because, not only had the five years privilege of both Lydia and Mary then expired, but also the five years allowed to the heirs of William Thomas, after his death, which occurred in 1840.

When the second amended bill was filed in January, 1853, all remedy was barred against all the complainants in favor of the new defendants therein.

As to the requisite adversary possession on the part of the defendants, which, for the moment, we assumed above, there can be no serious · question. Although, until the grant from the government to Governor Pope, there was no title adverse to the claim of Cloyes, that grant constituted such adverse title, and it conferred the seizin of the land embraced therein to the grantee, although at the time of its emanation, there might have been an actual occupation of the land by Cloyes, or his heirs claiming a pre-emption right thereto. That title had its inception the 15th of June, 1832, when the act of Congress was passed, under which the tract of land in question was ·selected in January, 1833, and patented in November following. Under this grant, Governor Pope, in the latter year, caused the entire tract to be laid off into lots, blocks and streets, and attaching it to the town of Little Rock, sold it out at public auction to divers purchasers, many of whom at once proceeded to build, and otherwise change the natural condition of the lots. ·Such open, notorious and unequivocal acts of ownership sufficiently indicate exclusive possession, in the absence of proof to the contrary, of which, there is none, except some vague statements of the residence of Mrs. Cloyes, and of a Mrs. Chandler, as her tenant, upon some portion of these lands, for a year or two after the public sales. To what extent, however, if in fact to any, the exclusive possession of the entire tract under the grant may have been prevented for this period by any such actual occupancy by residence, cultivation and enclosure, beyond which it does not extend, does not appear.

## As to Champerty.

The defendant, Bertrand, insists in his answer, by way of plea, that the conveyances to Fowler having been made *pendente lite*, are, for that reason, void; and also otherwise void for *champerty* appearing upon their face.

The recitals upon the face of one of the deeds, upon which this

objection is predicated, are to the effect, that the heirs-at-law of Nathan Cloyes, deceased, are entitled to a "pre-emption right" to the land in controversy in this suit, "concerning which the said Fowler, as the sole attorney and solicitor, has been for several years prosecuting a suit in chancery, in the name of said heirs, against the State of Arkansas, and several persons, and which suit has been lately decided by the Supreme Court of the United States in favor of said heirs, but which decision may not be final, and further litigation may be necessary to put said heirs into possession of said tract of land, which is their lawful right. Now, in consideration of the services of the said Fowler, as such attorney and solicitor, already rendered and hereafter to be rendered by him, or his substitute, until the final determination of said litigation, the said party of the first part grants, &c., one undivided fourth part of the entire right, title, interest, &c., in full for such services and the expenses of such litigation, to be borne by the legal representatives of Ben. Desha, deceased, who are also interested in said tract of land." And the same instrument of writing also constitutes Fowler sole attorney and solicitor, and also attorney in fact, with power of substitution, and full authority to institute and prosecute all necessary suits for obtaining possession of the land in question, to final judgment and satisfaction, and to compromise any matters relating to the affairs.

In the other deeds, the recital is merely to the effect that the consideration of the grant of a like interest of one-fourth by the other heirs at law, is the "services" of Fowler already rendered, and to be hereafter rendered.

The question arising upon this state of facts, involves the enquiry, whether the English law of champerty is in force in this State, to such an extent as to invalidate these deeds, and on that ground constitute an answer to the relief sought by the complainants.

The common law, so far as the same is applicable, and of a general nature, and all the statutes of the British Parliament in

aid of, or to supply the defects of the common law, made prior to the fourth year of James the First, (*A. D.* 1607,) not inconsistent with our own constitution and laws, are in force, and the rule of decision in this State, unless altered or repealed by our General Assembly. And when, by our laws, no punishment has been provided for any crimes or misdemeanors under the English law in force here under our statute, the punishment shall be by fine and imprisonment; the one not exceeding one hundred dollars, and the other not exceeding three months. *Digest, chap.* 35, *p.* 255.

It is not to be doubted but that the several English statutes of champerty were in aid of, and to supply the defects of the more ancient general law of maintainance: a law which peremptorily forbids the transfer to another of a right to seek redress in a court of justice. These statutes were designed to render this law of maintainance more efficient and perfect; and was suggested from time to time by the exigencies of the times, as the history of these enactments clearly enough show. The law of maintainance is to be traced no further back, in the history of the common law than to about the close of the eleventh century, when the Norman conquerer, having subjugated the country and despoiled the natives of their property, and dividing the whole Kingdom into sixty thousand Knights' fees had distributed them among his followers. "The first statute against champerty was passed in the year 1275, *Stat. Westm.* 1, *ch.* 25, 3 *Edw.* 1, It provided that no *minister* of the King should *maintain to have part.*" . Upon which Lord COKE says: "Hereby it appeareth that it is no champerty unless the State," &c., (that is, the agreement to divide the estate,) "be for maintainance." See *Bayard vs. McLane,* 3 *Harr. Rep.* 210. The terms of that statute, more fully set out, were: "No *minister* of the King shall maintain pleas, suits or matters depending in the King's courts for lands, tenements or other things, for to have part thereof, or other profit by covenant made; and he that doth so, shall be punished at the King's pleasure." 5 *Com. Digest, p.* 16, *Main. A.* "Ac-

54c

**666**  CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

cording to the commentary of Lord COKE, 2 *Ins.* 208, (by the words, depending in the King's courts,) it is declared that, regularly, champerty is, *pendente placito*, and that within the words of the statute 'or anything,' are included leases for years, and other goods and chattels, debts and duties." See 3 *Younge & Jervis Rep.* 134.

By 2 *Stat. Westm.*, *chap.* 49, 13 *Edw.* 1, the Chancellor, Treasurer, Justices, the King's Counsel, Clerks in Chancery and of the Exchequer, and other officials named, were forbidden to purchase, or to take by gift, lands or other matter in suit, *pendente lite.* 5 *Com. Dig.*, *page* 18. Upon which, Lord COKE, remarks, in his reading upon this act: "True it is, that if any other person, (*i. e.*, than the Chancellor, Treasurer and other persons named in the act) purchase *bona fide*, depending the suit, he is not in danger of champerty, but those persons here prohibited cannot purchase at all, neither for champerty or otherwise, depending the plea." 2 *Inst.* 84, cited in *Stanly vs. Jones*, 7 *Bing. Rep.* 377. These prohibitions—that in the one act, confined to the King's minister, and in the other, extended to certain officials mentioned therein— were afterwards, by statute 28 *Edw.* 3, *chap.* 11, (passed A. D. 1300,) extended to all persons, under still higher penalties, with the following proviso in the body of the act, *to wit:* "But it is not to be understood hereby that one may not have counsel of pleaders, or of learned men for his fee,, or of his relations or neighbors." See 3 *Younge & Jervis Rep.*, *p.* 135, for a full copy of this act.

Next in the order of time was the statute, *de definitio conspirat.* 33 *Edw.* 1, *stat.* 2, which declares that: "Champeters be they who move pleas or suits, or cause them to be moved by their own procurement, or by others, and sue at their proper costs, to have part of the land in variance, or part of the gains." 5 *Com. Dig.*, *p.* 16.

Besides these, there were other statutes passed in aid of the law of maintainance, forbidding persons to bind themselves by oaths, covenants or otherwise, to move or maintain pleas for

others, or " by letter or otherwise," to " maintain quarrels in the country to the let of the common law." *Ib.*, *p.* 17, 18.

In Hume's history of England, (*2d vol.*, *p.* 320,) the state of society, out of which sprung these stringent enactments, is referred to in connection with the *Statute of Conspirators*, above cited, and it is stated by this ·historian, that " Instead of their former associations for robbery and violence, men entered into formal combinations to support each other in law suits: and it was found requisite to check this iniquity by acts of Parliament." It might be worthy of further inquiry, if time would permit, whether this maddened state of public mind must not be legitimately traced to an unsettled state of property, resulting from a greedy assumption of estates by the crown for forfeitures as escheats, and the re-granting of those estates to favorites and followers.    At any rate, such inferences seem legitimate as connected with the subsequent parliamentary enactments in aid, and for strengthening the law of maintainance, occurring somewhat over two centuries afterwards, in the reign of Henry the Eighth. It was in the year 1538, that this King had completed the suppression of the monasteries in England, and proceeded to escheat their estates, and grant them· to his courtiers and parasites; and in the year 1540, he suppressed the Order of the Knights of Malta, and seized and disposed of their estates and revenues.    And it was in the latter year, (38 *Henry 8th*, *chap.* 9,) that by act of Parliament, " all former statutes against maintainance, champerty, &c., were confirmed;" and by the same statute, " that no person should unlawful y maintain or procure maintainance in any of the King's courts, &c., in any of his dominions, which have authority to hold plea of lands, &c., nor retain for maintainance of any sort, &c., on pain, &c., and no person shall buy · or sell, or·by any means obtain any pretended right or title, &c., to any manor, lands, &c., unless he who sells, &c., his ancestor, or they by whom he claims, have been in possession thereof, or of the reversion, or remainder, or take the rents or profits by the

668    CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY

space of a year before the bargain, on pain to forfeit the value of the lands. &c., so bought and sold." 5 *Com. Digest, p.* 17.

Thus, from time to time, stimulated to preternatural growth in strength, and all for the aid of violence and wrong in possession, the law of maintainance ultimately became monstrous and intolerable, and was destined to wane, if not altogether starve out, wherever justice might have sway, and right might be respected and sustained. And as a general fact, such has been the result both in England and in this country. Justice and right having been found indispensable for the growth of " commerce "—which soon afterwards " became King," and a greater *civilizer* than all the EDWARDS and HENRYS—it was, therefore, her policy to uphold the one, and respect and vindicate the other.

After such a glance as this, at the rise and progress of maintainance, in connection with its ultimate extensive ramification throughout the body of the English law, one can better appreciate some of the cant phrases in the books as to the "odiousness" and "crushing influence," which have come down even to our own day; and may be better able to comprehend the true policy of that law, and thereupon determine more advisedly whether it accords with the policy of the great current of the controlling laws of our own times in this country. And, perhaps, one may better understand, too, why it was, that in subsequent reigns, the English people were so clamorous for the right to resort to the courts of justice for the redress of grievances; and, that to this day, in that country, the public mind is so much engaged with judicial reforms, all having for their end the making of justice of easy access to every man.

At any rate, although it may be true that it is no valid objection to a law otherwise good, that it arose out of rapine and violence, and in its origin was made an instrument of despotism and wrong; still, when it might be made a question, whether a mere ancillary part of such a law was to be regarded as in force in this country, after the main law had been displaced by incon-

sistent affirmative legislation, the entire history of the whole can but throw some light upon the true character of what may be alleged to remain.

In this view, also, it may be seen that champerty, although originally applicable only to land (*campum partiri*,) was soon equally applicable to personal property; and, although, at one time confined to officers of the crown, was soon equally extended to all persons, while at the same time, the general law of maintainance was in a like ratio extended not only by these means, but otherwise by statute. It is also to be seen that unlawful maintainance was at the root of the whole matter, and the distinction between that and lawful maintainance, was never lost sight of.

It is no champerty, (says Lord Coke, already cited,) unless the "State, &c., (that is, the agreement to divide the estate,) be made for maintainance." So it is, in like manner, to be seen, that the proper advocacy of causes by persons belonging to the legal profession was not unlawful maintainance: and, therefore, it is no maintainance if a counsel take fees for his advice and assistance: (2 *Inst.* 564; 5 *Com. Digest, p.* 19: ) so if an attorney expends his money for his client, to be repaid." *Ib.*

And in this connection may be noticed a distinction between the English system of administering justice and our own, touching attorneys and counsellors, and their compensation, which is an important ingredient in considering this question of champerty. Under the English law, there was a total incapacity in counsel to make any contract whatever with his client, on account of his professional services, much less a contract for a share of the thing in suit, although he was permitted to accept as a gratuity, a fee. And the same was true of the attorney, who could make no other contract with his client than that which the law had already made for him, in assigning to every service its fixed and appropriate compensation. It was this absolute incapacity of contracting with each other, which placed the attorney and client in the same category with husband and wife, and guardian and ward, between whom no dealing can take place,

having the sanction of legal obligation. Hence, a contract between a counsellor, or an attorney and his client for a share of the thing in suit, under such a state of law, would have been illegal in a three-fold sense—on account of the restrictions upon the sale and purchase of the whole thing—of the part of it—and of the incapacity of the attorney or counsellor to buy.

In this country, there is no distinction in grade between attorneys and counsellors, and there is no distinction, as to this, in reference to compensation for professional services. Both stand on the same footing as to such contracts. And it is not to be questioned that our laws recognize the claim of an attorney at law for professional services, as a legal demand: and, that as such, he can recover a reasonable amount either on the ground of contract, or upon a *quantum meruit*. And physicians' claims, for medical attendance and skill, stand, with us, upon the same general footing: although they also stood in England upon the same footing with counsel in reference to compensation.

The right of making contracts is a high personal privilege of the citizen; and physicians and lawyers claim that privilege in their capacity of citizens, insisting that, by becoming professional men, they have lost no right pertaining to a citizen; at the same time, recognizing the authority of the Legislature to restrain and qualify this privilege as to contracts, in all points, where, in their judgment, the public safety or the public good may require it; but that, until so restrained by legislation, the courts are bound to recognize and protect this privilege, as well as every other personal right pertaining to the right of property, so amply secured to every citizen, whatever may be his calling, under our Constitution and laws.

When the courts hold, in the face of the common law to the contrary—in force in this country by express legislative enactment and otherwise—that such demands are legal ones, their decisions can rest upon no solid foundation, other than the recognition of this claim of right to contract, based upon our Constitution and laws, which, by reason of its inconsistency with the

English law, inhibiting the right to contract, has wrought its repeal, or, more accurately, has prevented so much of the English law from having force in this country. Because, if, by the adoption of the common law, in gross, as the rule of decision in· this country, those provisions of that law were in force, which denied to a counsellor any capacity to contract with his client on account of his professional services, and which denied to the attorney any such capacity, beyond that which the law had made for him in assigning to every professional service its fixed and appropriate compensation, the courts could not decide that a recovery could be had for professional services founded upon any agreement as to such services, either express or implied.

These decisions, then, rest upon the ground that the incapacity to contract as to professional services, has been removed by inconsistent legislation in this country. In this State—as, also, perhaps in most, if not all of the other States—there has been no legislation on the subject, except the general provisions contained in the paramount law, that all free men, when they form a social compact, are equal, and have certain inherent and indefeasible rights, among which are those of acquiring, possessing and protecting property, and of pursuing their own happiness.

It follows, then, that when the removal of the incapacity to contract for professional services is placed upon the ground of inconsistent legislation in this country, and that legislation, as in this State, is only the constitutional declaration cited, it must be removed without any other qualification or restriction than that which attaches to the privilege to contract enjoyed by citizens in general. The disability under the English law was not, specially, that the counsellor could not contract with his client for a part of the thing in controversy as compensation for his services; but, generally, that in reference to these services, he could not contract at all. There was no provision of the law inhibiting the purchase of a part of the thing in dispute, which was peculiar to lawyers: it was a provision common to all persons. It is, therefore, requisite to know upon what basis that provision

rested in the English law, in order to determine whether, under our legislation, it remains law in this State.

Beyond any reasonable doubt, the root of this doctrine was the principle of the common law, that a right of action could not be transferred by him who had the right, to another. "This principle was interlaced with the doctrines of maintainance and champerty, and was founded upon the same reason." Lord COKE says: "That for avoidance of maintainance, suppression of right and stirring up of suits, nothing in action, entry or re-entry can be granted over, for so, under color thereof, pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed." *McLane vs. Bayard*, 3 *Harr. Rep.* 209. Mr. Justice BULLER says, in the case of *Master vs. Miller*, 4 *Term Rep.* 340, "It is laid down in the old books, that for avoiding maintainance, a chose in action cannot be assigned or granted over to another. *Co. Litt.* 214, *a; Roll.* 245. The good sense of that rule," he proceeds to remark, "seems to me to be very questionable, and in early, as well as modern times, it has been so explained away, that it remains, at most, only an objection to the form of action in any case. It is curious, and not altogether useless, to see how the doctrine of maintainance has, from time to time, been received in Westminster Hall. At one time, not only he who laid out money to assist another in his cause, but he, that, by his friendship or interest, saved him an expense which he would otherwise be put to, was guilty of maintainance. *Bro. Tit. Maintainance*, 7, 14, 17, &c. Nay, if he officiously gave evidence, it was maintainance; so that he must have a subpœna, or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside, must be expected."

In the case of *Thallhimer vs. Brinkerhoff*, 3 *Cowen Rep.* 645, the Chancellor says: "It was a principle of the common law, that a right of action could not be transferred by him who had the right, to another. When we seek the reason of this rule, we find it in the motive already mentioned, an apprehension that

justice would fail and oppression would follow, if rights of action might be assigned. Nothing says Lord COKE," [as already more fully copied above in the quotation from *McLane vs. Bayard:*] "Feeble, partial and corrupt must have been the administration of justice, when such a reason could have force. In early times, however, the ruly was rigorously enforced. As the entire right of action could not be assigned, so no part of it could be transferred, and no man could purchase another's right to a suit, either in whole or in part. Hence, the doctrine of maintenance, which prohibits contracts for a part of the thing in demand, was adopted as an auxiliary regulation to enforce the general principle, which prohibited the transfer of all right of action. But the rule of the common law, that rights of action cannot be assigned, has been in modern times reversed. The apprehension that justice would be trodden down, if property in action should be transferred, is no longer entertained; and the ancient rule now serves only to give form to some legal proceedings. In the courts of equity this rule was never followed; and these courts have always considered and treated the rule as unjust, and have supported assignments of rights of action. Experience has fully shown, not only that no evil results from the assignments of rights of action, but the public good is greatly promoted by the free communion and circulation of property in action, as well as property in possession."

Hence, it appears, that the basis upon which the doctrine in question rested in the English law, was but that of a mere auxiliary regulation, to enforce the general principle which prohibited the transfer of all rights of action. Upon which the court, in the case of *Bayard vs. McLane*, at *page* 209, proceed to remark: "And upon no other reason can we conceive why a bargain for a part or the whole of a thing in suit, (independently of the maintenance,) should have been an offence at common law. In this country, the rule is actually reversed. The laws of alienation, in respect to every species of property, promote its transfer as more consistent with the condition of things here, and with public policy.

55ο

674          CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.          [JANUARY

By our laws, the transfer of a thing in action, or of a part of a thing in suit, may be made, and by the common law, it is lawful for attorneys and counsel, in the regular exercise of their professions, to maintain the suits of others. If the service, therefore, be lawful, and the mode of compensation be now lawful, how can such a contract be champertous and unlawful?"

In the States of Virginia, New York, Kentucky, Tennessee, Connecticut, North Carolina, South Carolina, and, perhaps, in most of the other States, the provisions of the *Stat.*, 2 *Westm.*, *chap.* 49, and of 38 *Henry* 8, *chap.* 9, more or less modified, prohibiting the purchases and sale of pretended titles to land not in possession, have been re-enacted. In some two or three of the States, the doctrines of those statutes have been recognized as a part of the common law. See *note F.*, to the case of *Whitaker vs. Cone*, 2d *Ed. of Johnson's cases*, *p.* 60.

But, the provisions of these statutes, upon which so much of the law of maintenance and champerty rests for support in the English law, so far from having been re-enacted in this State, have been met here by directly conflicting legislation, in the several provisions touching the sale of real estate held in adverse possession; whereby the right of "alienation and purchase" of every interest, title and estate therein, "has been enlarged almost to an unlimited extent," as this court said in the case of *Cloyes et al. vs. Beebe*, 14 *Ark. Rep.* 489, where it was held that, "under the several provisions of our statute, any right, title or interest in land, that will descend, may be alienated by deed, although the possession be adverse."

Such legislation must, in the repeal of the law forbidding the sale of real estate held adversely—if, indeed, it ever had any force in this State—also repeal so much of the law of maintenance and champerty as rested upon the old law; and there can be no serious question, therefore, but that, under the present state of the law, any interest title or estate in real estate, can be lawfully sold and purchased for a lawful consideration: and that

the purchase and sale of a moiety, or other part, will stand upon the same footing.

The latter branch of the provision cannot be any more doubted than the former, unless it should be supposed that a vendor could not sell a moiety or other part when in actual possession; because, the statute declared that the sale shall be "with like effect as if he (the vendor,) was in the actual possession thereof."

Hence, although it might be the law in England, in the year 1831, as held by Chief Justice TINDALL, in *Stanly vs. Jones*, 7 *Bing. Rep.* 377, that maintenance and champerty were not so much the buying of the thing, or an interest in the thing in litigation, as it was in the buying of the thing, or an interest in the thing for the purpose of maintaining and taking part in the litigation, it could not be law here, as to real estate held adversely, under our statute; because, it would, in effect, render that statute inoperative, since it would be rare, indeed, that one would buy real estate, so held, with any other than a purpose to go to law upon his purchase.

But another Judge, Lord ABINGER, in a later case, (A. D. 1843,) seems to have a different idea of what remains of the law of maintenance in England, its birth-place. We shall, probably, have occasion to cite him before we are done.

We conclude, then, upon this point, that the interest in the land in question could have been lawfully sold and purchased; and it remains to be considered, whether the professional services of Fowler, under the facts of the case, were a lawful consideration for such sale.

The greatest difficulty in the way of arriving at accurate ideas on this point, is from the habit, that some have, of associating, in a peculiar manner, the idea of champerty with the lawyer and his services, and his client, while, in truth and in strictness, the English counsellor was further removed from champerty, as to his own client, than from his brothers. And, so far from his professional services being procreative of champerty, they could not beget it at all; because they were not accounted of any

676 CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [January

value, in point of law, so as to form the consideration of a contract with his client for a part of the thing in suit. It is, in this country, only, that such legal value has been accounted to them by the law, and in awarding that legal value, as we have seen, the courts have proceeded upon the idea that the lawyer's work and labor stood upon the same ground as that of any other citizen; as did his legal capacity, also, to contract in reference to them. If so, it must be as lawful to pay debts, or buy land with, that may be lawfully sold, as that of any other citizen. If the English attorney had, upon the consideration of fees taxed to him, bought from his client an interest in the thing in suit, he would have been guilty of champerty, not because these fees arose from his professional services, or because of the relation of attorney and client, but simply because he had purchased a part of the thing in litigation. And he would have done no less, but precisely the same thing, if he had taken money out of his pocket to form the consideration, instead of resting it upon the costs taxed to him. It is often said in the old books, that champerty was the most odious form of maintenance, and that was, because it was not only a violation of the general law, but also of the auxiliary one, which aggravated the offence. But it is never said, in addition to that, that the offence is still further aggravated in point of law, because committed by a lawyer, or was in any way connected with his professional services, or with his relation to his client.

There is nothing, then, in the common law notions of champerty peculiar to lawyers, or to their professional services, not common to other champertors, except that, as to the general law of maintenance, they stood upon a more favorable footing than other subjects of the King, for as much as they could lawfully maintain their clients' cases with their professional services, while another subject could not maintain a suit at all, without violating the law, unless interested in, or related to, the party whose suit he might maintain. There is, therefore, no foundation for supposing, that by the adoption of the common law, we have adopted

any provision of the champerty law in reference to lawyers, and the relations between them and their client, that is not equally applicable to every person.

When a part of the land in controversy may be lawfully sold, as in this case we have seen it might be, to say that a lawyer in this country cannot take money out of his pocket and buy with it from his client, is to say more than was ever said in England, when the law of maintenance was in its most rampant condition of monstrosity. Because it was then allowed to be so, simply because the law forbade a sale and purchase of the land; not because of any incapacity of the counsellor to buy with his money from his client. If the land had been subject to lawful sale, he could have bought with his money: but, although he could have bought with his money, he could not have bought with his professional services, because they were accounted of no pecuniary value, and he could make no contract with his client in reference to them. But when, as it is allowed in this country, these services are of pecuniary value in point of law, and contracts with reference to them are of as binding force in law, as when made in reference to the services of the citizen, to deny that they are a valid consideration for a purchase and sale, that may be otherwise lawfully made, is to stultify the decisions of all our courts, which have recognized their services as valuable, and subject to contract; and go back to the common notion of the lawyer's incapacity to contract with his client in reference to his professional services. And, if this is not done, then there is but one alternative, and that is to stop short and legislate. And while another department of the government, in doing this, would have ample power to regulate the right of contracting between attorney and client, in points where it might seem proper, all the argument would not be upon the side of an inhibition upon the attorney to become interested in the law suit, and in its result. There is nothing in our policy favoring the hampering of right and justice if presented for investigation within the time limited for legal remedies. And the door of justice is not shut to the poor, who may be oppressed.

678            CASES IN THE SUPREME COURT ·

Lytle et al. (Cloyes' Heirs) vs. The State et al.            [JANUARY

On the contrary, they have been the subject of statutory provision. Rights are nothing without the means of enforcing them. The subject matter of the suit may be all the property to which the suitor can lay claim. Whether plaintiff or defendant, his credit may be based upon nothing else. The courts of chancery are ever open for relief against fraud and oppression, and they look with a scrutinizing eye to contracts which savor of either. If just suits are stimulated by such a policy, unjust ones are checked by the punishment affixed by our Legislature to the offence of barratry, which is a fine in "any sum the barrator may be able to pay, not less than one hundred dollars, with imprisonment for six months." *Digest, chap.* 51, *sec.* 16, *p.* 362. And this, at least, does not seem to place us in a condition, as to these doctrines, far different from that of the English notion at the present day, if Lord ABINGER is to be received as authority for the present condition of the law of maintenance in that Kingdom. He says, in the case of *Findon vs. Parker*, (11 *Mees. & Wel.* 682,) decided in the Exchequer of Pleas, in the year 1843: "The law of maintenance, as I understand it, upon modern constructions, is confined to cases where a man improperly, and for purposes of stirring up litigation and strife, encourages others to bring actions, or to make defences which they have no right to make."

The truth is, this whole law of maintenance, with its appendant law of champerty, has been in a very great degree displaced in modern times by the invention of statutes of limitation, which the States, generally, have adopted, as well as the English people, of which our ancestors had no knowledge.

Perhaps we could not conclude this part of the subject better than by some further remarks of the Chancellor, in the case of *Thallhimer vs. Brinkerhoff*, 3 *Cow. Rep.* 643 : "The excitement of suits, is an evil when suits are unjust; but, when right is withheld, and the subject of a suit is just, to promote the suit is to promote justice, where the administration of justice is firm, pure and equal to all; and where the laws give adequate redress

for groundless suits, it is not easy to conceive that mischief can arise from opening the courts of justice to all suitors; or, from contracts by which the fruits of the suit may be divided between him who has the right of action, and him who has contributed advice, expense or exertion to institute the suit, or prosecute it to effect. If principles are to be consulted, it seems to be of little moment whether he who maintains the suit of another receives his reward from the subject of the suit, or from any other property of the suitor. Champerty is one species of maintenance: but the authorities do not declare contracts for a part of the thing in demand universally unlawful. The distinction made by the books between interference which is illegal, and that which is lawful, consists in the rule and the exceptions stated: and where maintenance is lawful, as in the case of interest in the subject, or relation to the suitor, a contract to divide the subject of the suit, which is maintenance in a particular form, is also lawful."

Holding the purchase and sale to have been lawful, it but remains to be considered whether the liability of Fowler for costs as a party to the amended and supplemental bill, predicated upon his purchase, and his subsequently becoming a party to the suit, rendered him obnoxious to the objection of unlawful maintenance. We have seen that he might lawfully maintain the suit of his clients with his professional services: but, according to the common law rule, he could not go beyond this and support his clients' cause, at his own proper costs. "In the payment of the costs, or by agreeing to pay them, he acts out of his character as a professional man, and maintains the suit in a way which that character does not justify. But, so long as his contract stipulates only for such services as he may lawfully render without being guilty of maintenance, it is not vitiated on any ground of champerty, because those services are to be requited out of the thing in suit, which, by our law, is a proper subject of contract." *McLean vs. Bayard*, 3 *Harr. Rep.* 212. Clearly, as to this point, Fowler is to be considered as incurring costs, not for his clients, but on account of his legal interest, and for himself. If he could

not go to law, and incur costs in respect to his purchase, it would be nugatory, as we have already said. The subject of his purchase having been held adversely, the law authorizing the purchase and sale, must have contemplated that the purchaser would go to law to recover it.

We conclude, then, upon the objection of champerty, that it cannot be sustained, and affords no answer to the relief sought by the complainants.

In passing upon the objection for champerty, we have, also, in effect, passed upon the other objection, that the sale and conveyance were made *pendente lite :* because the doctrine, that a sale and conveyance of land, made *pendente lite,* are void, was founded exclusively upon the several acts of Parliament against maintenance and champerty.

In the case of *Jackson vs. Ketchum,* 8 *John. Rep.* 479, B. purchased the lands in controversy of C., pending an action of ejectment for the recovery of their possession, and it was held that the deed was void, under the statute of New York, " to prevent and punish champerty and maintenance." That enactment, the court said, contains the substance of the English statutes of *Westminister* 1, *chap.* 25; *Westminister* 2, *chap.* 49; and of 28 *Edw.* 1, *chap.* 11, and was almost a literal transcript of the last.

In *Parks vs. Jackson,* 11 *Wend. Rep.* 442, it was admitted that the effects of *lis pendens,* upon a conveyance of land, operated harshly, and that the rule was not without exceptions.

In Alabama, in the case of *Camp vs. Forest,* 13 *Ala. Rep.* 120, where the question was made upon a sale, *pendente lite,* by the party in possession of land, the court say : " We have seen no decision resting upon common law principles, which maintains that a sale and conveyance of lands, of which the vendor is in the possession, is void merely because an action is pending for its recovery, and we are aware of no principle of policy in this country, which would invalidate a transfer of land under such circumstances. We may add, that we find many cases in

which the effect of *lis pendens* to impart notice of the matter in controversy is considered : but in none that has come under our observation, has the pendency of a suit for the land been held to take from the party in possession the right to sell it, in the absence of a statutory provision," (like 32 *Hen.* 8, *chap.* 9). That court accordingly held that the sale and conveyance was valid. And this authority is the stronger, because, by a number of decisions of the Alabama court, the English champerty and maintenance laws are held to be in force in that State.

So far from there being any prohibitory law in Arkansas, our statute expressly authorizes a sale of any interest in land, as we have seen, although the possession thereof be adverse, "with like effect, as if he (the vendor,) was in the actual possession thereof." *Digest, chap.* 37, *page* 265, *sec.* 6.

In Virginia, where the statute, 32 *Hen.* 8*th*, is in force, the courts hold distinctly, that it does not have the effect to make the sale and conveyance void. 1 *Rand. Rep.* 98; 3 *Call Rep.* 481. And besides, that the sale of an equitable interest in land is not within the statute. 1 *Leigh Rep.* 248.

We think, therefore, that the sale and conveyance in question were not void because of its having been made *pendente lite.* Of course, the vendee took the interest conveyed to him, subject to every defence against his vendor, and holds it precisely as he held it, in every respect, as to other persons. *Merrick & Fenno vs. Hutt,* 15 *Ark. Rep.* 344.

Before proceeding to consider the only remaining question, which involves the entire cause — as it was contended in argument, that the questions did which we have determined — we will remark, that there are two other subjects discussed by counsel at full line, which it will not be necessary to investigate and determine, unless this remaining question shall be found for the complainants. The one subject relating to rents and profits of the land in controversy, and the right to set - off improvements against them ; and the other, to a defence of purchaser, for a

56c

valuable consideration, without notice, interposed by a part of the complainants.

As to the first subject, should it become necessary to consider it, a reference would have to be made to the master to ascertain facts which do not appear in the record; and, in connection with the order of reference, and the master's report, the question discussed will be more properly considered. And, as to the latter, although upon that defence some of the defendants may be entitled to a final discharge, irrespective of the validity of the preemption claim in question; nevertheless, should that claim be found invalid upon the grounds remaining to be examined, they would, on that account, be decreed to go hence without a resort to this more special defence.

These matters will, therefore, be reserved until it may become necessary more particularly to examine and adjudicate upon them.

## As to the Facts in Reference to Validity, and to Fraud.

Having considered these questions, it remains to be determined, whether the fraud, alleged by the defendants, can be found upon the testimony in the cause. If it be found, it is not to be doubted that it will reach even that part of the complainants' case, which lies behind the finding of the Register and Receiver, although the act of Congress, of the 4th of July, 1836, (1 *Land Laws and Opinions, page* 553,) had not then been passed.

It is objected, however, that the defendants have no right to interpose that defence; that fraud and injury must concur to entitle a party to redress; that, although Cloyes may have defrauded the Government, these defendants were not then interested, and could not thereby have been injured. And as they have since acquired an interest in the subject of the alleged fraud, they ought to be regarded as mere volunteers, who have thrust themselves into a controversy properly belonging to other parties.

This objection has already been substantially responded to; but, in order to ascertain more distinctly the attitude of the parties, which seems proper before going at large into the question now to be determined, that answer will be still further amplified.

The defendants are not seeking redress: nor have they come into this court as volunteers, to assail any supposed rights of complainants—on the contrary, the complainants have come here to assail the defendants' title for illegality, and have brought the latter here on compulsion. And, in order to show the illegality of the defendants' title to the land in controversy, the complainants allege the legality of their own rights thereto, which the defendants denying, in their turn allege fraud in the complainants in support of their denial, and insist that, upon the whole evidence in the case, it ought to be found.

If, under the circumstances in this case, the complainants had had the legal title to the land, instead of the defendants, and the parties were reversed, there would have been something in the objection to be considered: there is nothing in it, however, as the case actually stands.

In examining this question of fraud, our attention, in the first place, will be turned to the finding of the Register and Receiver, not to determine whether or not there was sufficient evidence before them to authorize their finding, but whether or not, from all the testimony in the case, their finding was not in truth superinduced by fraud, on the part of the pre-emption claimant.

According to the act of Congress, granting the pre-emption right in question, "proof of settlement or improvement, shall be made to the satisfaction of the Register and Receiver, agreeably to rules to be prescribed by the Commissioner of the General Land Office, for that purpose. See *section 3 of the act of* 1830. The Commissioner, by his circular, No. 479, dated the 10th June, 1830, (*Instructions and Opinions, part 2, page* 539,) prescribed as to that, that the fact of cultivation in 1829, and the possession of the land applied for on the 30th of May, 1830, must be estab-

684      CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

lished by the affidavit of the occupant, supported by such corro-
borative testimony as may be entirely satisfactory, &c., and be
in answer to such interrogatories as may be best calculated to
elicit the truth."

Cloyes, the claimant, after having been interrogated, and an-
swered as to what tract of land he claimed a pre-emption, was
further interrogated thus: "Did you inhabit and cultivate said
fraction of land (meaning the tract in controversy,) in the year
1829; and, if so, what improvement had you in that year in cul-
tivation? Answered—"I did live on said tract of land in the
year 1829, and had done so since 1826, and in the year 1829
aforesaid, I had in actual cultivation a garden, perhaps to the
extent of one acre; raised vegetables of different kinds, and corn
for roasting ears; and I lived in a comfortable dwelling, east of
the Quapaw line, and on the before named fraction."

*Interrogatory 3d.*—"Did you continue to reside and cultivate
your garden aforesaid, on the before mentioned fraction, until
the 29th of May, 1830?

*Answer.*—"I did, and have continued to do so until this time,"
which was April 23d, 1831.

*Interrogatory 4th.*—"Were you, at the time of the passage of
the act of Congress, under which you claim a right of pre-emp-
tion, a farmer: or, in other words, what was your occupation?"

*Answer.*—"I was a tin plate worker, and cultivated a small
portion of the fraction before named, for the comfort of my fam-
ily, and carried on my business in a shop adjoining my house."

The corroborating testimony was from John Saylors, who an-
swered to interrogatories propounded him, as to Cloyes' settle-
ment and cultivation, as follows, *to wit:*

*Answer.*—"I know that, in the year 1829, Nathan Cloyes lived
below Little Rock, near the river, on the Quapaw lands, and am
satisfied that it is the fraction which the claimant, "Cloyes," has
stated in his deposition above. I further state said claimant was
living on said fraction with his family in a house, and cultivated
a small piece of ground, about one acre, near to house, and raised

during that year, corn, and different kinds of vegetables, and that said claimant, Cloyes, continued to remain on said fraction for that year until the present time, and under the same cultivation each season; and I further state, that the said claimant is a tinner, and did, in the year 1829 aforesaid, carry on his business at the improvement before named, and continued so to do until this time."

Maynor and Bussey also swore, that Saylors' affidavit "contains the truth, as they are knowing to all the facts."

With regard to the affidavit of Cloyes, it is plain enough, when the questions propounded to him are considered in connection with the answers given by him, that he did represent on oath, that from the year 1826, up to the 23d of April, 1831, he had lived on the tract of land in controversy; and that in the year 1829, he cultivated about one acre of the land for the benefit of his family, and "lived in a comfortable dwelling house" thereon, "and adjoining the shop," in which he carried on the business of a tin plate worker, and continued so to reside and cultivate up to the 23d of April, 1831. He did not state where the cultivation was, in point of locality, beyond that it was on the fraction in question. The shop and comfortable dwelling house, he said, were adjoining each other. But Saylors says, however, that it was near the house in which he was living on said fraction with his family, in the year 1829. So, that the shop and comfortable dwelling house were adjoining, and the cultivation was near the latter. Saylors, however, does not say that the family remained on the land the whole of the year 1829, or ever afterwards lived on it: but that Cloyes, the claimant, did, and up to 23d April, 1831, "and under the same cultivation each season," and "continued to carry on his business at the improvement before named by him."

With regard to Cloyes' representation as to his residence upon the land in question, there is not one single witness in the whole case that sustains him. It is probable that the Register and Receiver regarded Saylors' affidavit as doing so; but, from the light

now derived from the mass of the testimony in this cause, taken in connection with Saylors' guarded expression as to the occupancy of the land in the year 1829, and up to the time when he swore, it is manifest, that he and his supporting witnesses do not sustain Cloyes as to this: although it is entirely probable that it was their design that it should be so regarded by these officers. And it is utterly impossible to resist the conclusion that Cloyes, knowing the falsity of his representations on this point, must have intentionally deceived the officers as to this matter; while it is equally evident, that Saylors and his supporting witnesses, Maynor and Bussey, with equal knowledge, were consenting to, and aiding in, this deception: and they were enabled to do so with some plausibility, by the fact deposed to by Calloway, that in the latter part of 1829, or first of 1830, Cloyes, in anticipation of the passage of the pre-emption law, and for the purpose of obtaining the benefit of the same, moved his family to his tin shop, where they remained a short time, with the convenience for residence of some loose plank set up for shelter, at the end of the shop, with some little bedding therein: and by Baker, that about a month after the news reached Little Rock, in 1830, of the passage of the law, the family resided at the tin shop for a month or two after having removed there in the night. And these fraudulent removals are corroborated by Jenkins, in his statement as to his removing for Cloyes certain articles of furniture in 1829 or 1830, from the tin shop to his family residence, across the town branch.

And, with regard to the alleged continued cultivation, sworn to by all these witnesses, it is manifest, from the whole testimony in the cause, that this was represented to the Register and Receiver with as little regard to truth as the residence of Cloyes was, and with equal tendency to deceive those officers, and mould their judgment as to the *bona fides* of Cloyes' alleged cultivation and occupancy. Cloyes swore that he continued to cultivate the garden, which he had represented he cultivated in 1829, not only until the 29th of May, 1830, but also up to the 23d of

April, 1831: and Saylors, and his supporting witnesses, say that Cloyes continued to remain on the land in question during the year 1829, up to the 23d of April, 1831, and "under the same cultivation each season."

Whether, in point of law, it was, or was not necessary for Cloyes to have resided with his family upon the land in question in 1829, and afterwards, as he represents: and to have continued to cultivate in 1830 and 1831, up to the 23d of April, as all these witnesses represent, is not material in the aspect of our present enquiry; because, although unnecessary, these misrepresentations did not the less tend to deceive the Register and Receiver as to the true character of the alleged cultivation and occupancy, upon the ground of which they based their judgment, that he was entitled to a pre-emption to the land in controversy.    Unquestionably, if these officers had, from the testimony before them, come to the conclusion that the alleged cultivation and occupancy was but colorable, and not substantial and *bona fide*, they could not have allowed the claim under the law.    Hence, the instructions to them before alluded to, were to the effect, that the evidence in support of a pre-emption claim, was to be "in answer to such interrogatories as may be best calculated to elicit the truth."

And, clearly, such representations as Cloyes made of his actual residence upon the land in controversy, in a comfortable dwelling for his family, adjoining his shop, so artfully sustained by the other witnesses; and such representations as they all made as to his cultivation in the year 1829, 1830, and up to the 23d of April, 1831, went, at once, strongly and powerfully to exclude any idea of fictitious and colorable occupancy and cultivation, and to establish such, as *bona fide* and substantial.

Under such circumstances, a court of chancery may, with propriety, find reason to disregard the finding of the Register and Receiver, and to consider the alleged pre-emption right, at large, upon the allegation and proof.    And, in doing so, hold the complainants, who are seeking to set it up against rights fairly and openly obtained, to the *onus probandi*.

688        CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.        [JANUARY]

And certainly, these same circumstances are not of a character to bespeak favor for the complainants' case, as it must now be considered. And there are other circumstances which can but give rise to doubt and suspicion as to its validity. Of this nature is the contract of Cloyes with Desha, bearing date the 17th of April, 1831, by which he stipulated to convey "to the latter one-half of his pre-emption right in consideration of Desha's defraying the necessary expenses incident to proving up and establishing said right in the Land Office at Batesville, and of clearing the same out of said office by paying the minimum price per acre therefor." Considering the local situation of the land, immediately adjoining the town of Little Rock, then the seat of Government for the Territory, embracing the steam-boat landing, and a part of the bluff upon which the town was built, adjoining the point of rocks, in the immediate vicinity of which the principal business of the town was then transacted, it was a very extraordinary contract on the part of Cloyes, provided his claim was a valid one, to say nothing of its direct tendency to defraud the pre-emption law.

Of this same nature, is the great lapse of time which intervened between the point of time when the Secretary of the Treasury, "unwilling to prejudice any claim of the heirs of Cloyes under the pre-emption law, and that they might be more effectually enabled to maintain their rights before the proper judicial tribunals," authorized the money to be received, and a certificate of purchase to be issued to these heirs, to enable them to appeal to the courts, and the point of time when judicial proceedings were first commenced in their behalf—a period of upwards of nine years—the certificate having been issued to them on the 5th March, 1834, and the first bill of complaint was filed 23d of March, 1843.

It is true, that the heirs of Cloyes were, during this interval, minors, under the age of twenty-one years. But it appears in the evidence, that Desha, on the 11th of March, 1834, in consideration of two hundred dollars, and of professional services

then already rendered, and to be afterwards rendered, in advancing and defending Desha's interest therein, conveyed to William Cummins one-half of his (Desha's) interest in the pre-emption claim. Cummins, it appears from the evidence, was a lawyer of ability and prominence, and resided at Little Rock, and did not depart this life until April, 1843. His name appears frequently in the voluminous documents certified from the General Land Office, as the advocate of the heirs of Cloyes, and as their lawful guardian. His professional character forbids the inference that he could have been ignorant of the legal rights of his wards; and a court of chancery would have secured him, by a lien upon the land recovered for them, whatever he may have advanced for the just prosecution of their rights, as well as just compensation for his professional services in their behalf, to say nothing of the additional stimulant to action, on his part, as the counsel of Desha, and to forward his own interest, derived by that retainer. Nevertheless, for all this, although the courts were open to him for a period of over nine years before his death, up to which time he was in the actual practice of his profession, he does not appear to have commenced any proceedings in the courts of justice. It is true, that these heirs, in a legal point of view, would not be prejudiced by the laches of Mr. Cummins, their guardian; still, these circumstances are not without some significancy in repelling inferences, in their favor, arising from their minority.

There are other circumstances, however, more favorable to the complainants, which, as they have been specially urged by their counsel, may be considered here, and those are the statements of Gov. Pope, and his successor in office, Gov. Fulton, in their correspondence with the Commissioner of the General Land Office, and the Secretary of the Treasury, conceding cultivation and occupancy, but urging the invalidity of the pre-emption claim upon the ground that Cloyes was the tenant of Ashley, under a written lease: in which lease, the house and gardens leased are stated to be on the Quapaw reservation, immediately east of Little Rock.

It appears from the testimony in the cause, that Governor Pope

57c

690        CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.        [JANUARY]

did not come to the Territory until the fall of 1832, and could not, therefore, have had any personal knowledge of any cultivation and occupancy in 1829 and 1830; nor does he pretend to have had any such knowledge. On the contrary, from his whole statement taken together, it is manifest he was proceeding upon the information of other persons, which led him into errors of date, at least as to the lease from Ashley to Cloyes. And the same remark, as to hearsay, is also applicable to the statements of Governor Fulton, as is equally apparent when taking his whole statement together. And his statement about the house in question having been removed across the Quapaw line, ten or twelve years before—which, by mistake as to the true line, was not effected or fully effected as it otherwise appears in the record—in connection with the fact that the Point of Rocks, which was the river terminus of the Quapaw line, was not an acute point terminating in the river, but an irregular mass of rock, allowing of scope for the line to vary fifty feet or more, and the fact, testified to by Doctor Cunningham, that the timber near this place, had been cut off for building and domestic purposes at an early day, will, in some measure, account for the conflict in the evidence as to the locality of the house and garden in question, in reference to the Quapaw line.

Crittenden's unsworn and unguarded statements, made in a political publication during a canvass, are also urged by the complainants' counsel. These, according to the rules of law, can be of no weight against any unimpeached and sworn testimony with which they may come in conflict; and in this very statement he says, "from distance of time there may be some unintentional errors," and that he was interested in the claim of Cloyes, under his bond to him for the ferry privilege of the margin of the river, and had also a verbal promise of a half acre of land eligibly situated in case of success in the establishment of the pre-emption claim. If Mr. Crittenden had had a personal knowledge of the matters stated in his publication, which that does not purport, Cloyes could have had the benefit of his tes-

timony with apparent convenience, at the time he proved up his pre-emption right at Batesville, in lieu of that of Maynor, Saylors and Bussy, who with Cloyes, according to the deposition of Mrs. Stevenson, "were all drinking, and hanging about the door of the Land Office"—because Mrs. Stevenson says, that at the same time, Mr. Crittenden was at Batesville, and was one of the corroborating witnesses as to her pre-emption claim, then also established at that Land Office.

Although all these several matters, in themselves, are of no controlling import, yet, in considering the complainants' case at large upon the facts, they must be brought into the estimate, while considering the whole testimony, in order to determine whether the complainants have made out their case over the testimony brought against it. And while looking into this, we have found the Chancellor's condensed statement of the testimony touching the alleged cultivation and possession so accurate, and his comments thereon, and in that connection, so apposite, that we shall adopt and incorporate the following portion of his opinion, with the further remark, that after a careful comparison of that statement, with the version of the same testimony given by the counsel upon the opposite sides of the case, in their printed briefs, verified by the manuscript transcript as we progressed, we have found all the errors against the complainants far more than compensated by errors in their favor, *to wit :*

"The act under which Cloyes claimed his pre-emption required him to be a settler or occupant of the land: to have had some part of it in cultivation in 1829, and to be in possession of it at the date of the act, 29th May, 1830.

"To be a settler, or occupant, he need not reside on the land, though residence on, and deriving a support from it, or using it in tillage would have been satisfactory, and the highest proof of settlement or occupancy. But cultivation of the land, wherever a man resided, was sufficient under the act. And the cultivation should be such as would be made in raising a crop for farming purposes, whether that be of grain, esculents, or whatever is raised

**692**     CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

from the ground by tillage. But, amid all the instructions and opinions of executive officers and judicial constructions of the act, I cannot find that occupying a building alone, and for mechanical purposes, solely, has been pronounced a settlement, or occupation under the act, and I do not think it is. I shall hold the mere use of the building by Cloyes, as a tin-shop, an insufficient compliance with the act. It clearly cannot be taken as cultivation in 1829. I shall require something else to constitute possession on the 29th May, 1830. And there is much greater propriety in doing so in this case, when the precise locality of the shop belongs as well to another tract of land as to the one in controversy.

"A condensed statement of the testimony upon the cultivation of Cloyes in 1829, and possession 29th May, 1830, will be given— the depositions to be taken up in the order they fall into my hands, without regard to conclusiveness, or clearness of the testimony, or whether adduced by the complainants or the defendants.

" *Burke Johnson* says, he arrived at Little Rock, 27th May, 1829, when Cloyes and family lived just below the point of rock, where they continued to live till the latter part of 1830, or early part of 1831. Cloyes cultivated a garden of vegetables in 1829 and 1830.

"Although Johnson does not, in terms, confine the locality of the garden to the place at the point of rock, I take him to mean so, and he has well enough expressed it to require me to consider him as having sworn to the cultivation and possession below the Quapaw line. And he is one witness that has done so.

" *Robert A. Calloway* says, from the time he came to the State, in the fall of 1825—he knew Cloyes and his family well; was in the constant habit of visiting Cloyes and his family, during the time when these facts of cultivation and possession should exist; that, during that time, Cloyes lived one hundred yards or more south of Daniel Ringo's brick residence, and never resided any where else, except, that in the latter part of 1829, or first of 1830,

he moved down to the tin-shop, with part of his moveables only, and was there but a short time; that the tin-shop was on lot 1, in block 35, of the old town, a little west of the Quapaw line. Cloyes never cultivated the ground, nor enclosed, nor made any improvements. His testimony is as positive as need be, and I take it as full, in disproving of the facts of cultivation and possession.

"*George Ellison* states, he knew Nathan Cloyes from 1826 or 1827, till his death; that, as well as he recollects, Cloyes was living on the bluff, east of the Quapaw line, and cultivated a garden there in 1829 or 1830, or both of those years. His testimony is too indefinite to prove anything about the essential facts of cultivation in 1829.

"*Stephen Cotter* says, from 1826 to 1831, the time of Cloyes' death, the principal part of the time he lived immediately above the steam-boat landing, and east of the Quapaw line: that in 1829 and 1830, and how much longer he does not recollect, Cloyes lived and cultivated a garden there; that Mrs. Cloyes, with her family, after her husband's death, removed to the same piece of ground, but not to the same house they occupied in 1829 and 1830. In the identity of the ground this witness is mistaken, as he refers to the *Hutt* place, which is not on the fraction in controversy, but I do not consider that as detracting from the positive testimony given about the cultivation and possession in 1829 and 1830, and I class him as the second witness who proves those facts.

"*Matthew Cunningham* states, he was acquainted with Nathan Cloyes and his family in 1828, and thence till Cloyes' death; that, during that interval, except, perhaps, a part of 1828, they lived on the Fulton and Hutt places; that Cloyes occupied the tin-shop, which he locates west of the Quapaw line; that there was no cultivation of the soil or improvement about the tin-shop in 1829 or 1830.

"*Asa G. Baker* deposes, that in 1826, Cloyes and family lived near the point of rock, in a house which stood on, or west of the

694      CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.    [JANUARY

Quapaw line, a part of the shop being east of it, and after a year removed to the Fulton house, at which, and the Hutt place, they lived till news was received of the passage of the pre-emption law of 29th May, 1830, when he moved down to the tin-shop, staying there some two or three months, or less. Except this interval, the family, from 1828, was always at the Hutt place till Cloyes' death: and that he never knew Cloyes to cultivate any land. This witness disproves the cultivation in 1829, by inference, and possession 29th May, 1830, positively; and I take him as a good witness for defendants on both points.

"*B. F. Owen* says, that in the spring of 1829, Cloyes and family lived near the point of rock: does not recollect whether there was any garden or improvement about the claim. This witness does not prove either of the essential facts—cultivation in 1829, or possession 29th May, 1830.

"*Louisa Carr* proves, that Cloyes and family lived near the point of rock, in October, 1829. Her testimony does not touch either of the facts, and is not taken into consideration.

"*Charlotte Cady* says, that in 1829 and 1830, Cloyes and family lived near steam-boat landing, below the town: that he cultivated a garden there in 1829: she is the third witness that proves both facts for the complainants.

"*William Flynn* states, that in 1828 or 1829, and probably in both years, Cloyes and family lived at steam-boat landing, just below point of rock, near the Quapaw line, and had a garden in cultivation and vegetables growing in it: does not know whether the garden was above, below or back of the shop or cabin. This testimony does not come up to the points to be proven.

"*Joseph Bone's* testimony cannot be taken to establish the date of either fact; as his recollection of dates is too inaccurate for reliance upon it; notwithstanding the facts of intimacy, and residence at the tin-shop, at some time, may be established by it.

"*Robert Allcorn* says, that in 1829, Cloyes and family lived on the bluff below Little Rock, as he supposes, from seeing the family at the tin-shop; does not recollect of seeing any furniture

there. He proves no cultivation in 1829, nor possession 29th May, 1830.

" *Caleb Ricketts* states, in 1829 as well as in 1828, Cloyes and family lived below the Quapaw line, and had a garden there, in both of these years—the garden extending round the house in the shape of an " *ell* " towards the Quapaw line—a turnip patch in the garden. This witness is so much mistaken about other important facts in his deposition, namely: about the sole steamboat landing of the place being above the point of rock, and the Quapaw line running through a house across the road from the tin-shop, that he cannot be taken as a reliable witnes to prove the localities of the time and place he was testifying about. And if he be right about the situation of the garden with the house, according to the indisputable testimony of the location of the house, the garden must have been partly west of the Quapaw line. I shall consider his testimony as tending to prove one of the facts—cultivation in 1829; but shall not give much weight to it.

" *Benjamin Clemens* says, that from 1827 to 1831, Cloyes and his family did not live at any place but the Fulton and Hutt places. In 1829 and 1830, there was no cultivation or improvement about either the Thornhill house, or the tin-shop: it stood without any enclosure: that there was a little rail pen south of the shop when Thurber lived there, before Cloyes had his shop there, to protect the pots and kettles; that Cloyes never did live at the tin-shop, nor in the neighborhood of the point of rock.

" *Hezekiah Jenkins* came to Little Rock about the last of November or first of December, in the year that Governor Pope came to Arkansas, and Cloyes was then living at the tin-shop near the Quapaw line, below where he had been shown the line was. From the location this witness' gives the garden and the tin-shop, as compared with George's store, his testimony cannot be taken to establish, or deny either of the two important facts. It would show cultivation, late in the fall, by Cloyes, west of the Quapaw line.

696      CASES IN THE SUPREME COURT

Lytle et al. (Cloyes' Heirs) vs. The State et al.     [JANUARY

" *Ezra M. Owen* says, Nathan Cloyes occupied a small house, and cultivated a garden near the bank of the river, east of the Quapaw line, in 1829 ,and so did, till his death, the garden adjoining the house, south-east of it, and Cloyes had possession of the house and cultivated the garden during May, 1830: identifies the land. This witness proves the facts of cultivation and possession.

" *Robert A. Watkins* says, in 1829 and 1830, he attended Cloyes' family, as a physician, by the year—quite certain never attended them but at Fulton and Hutt places, and that they never lived at any other place, during these years. This witness disproves the possession in 1830; but not the cultivation in 1829: says nothing about it.

" *Noah H. Badgett:* From March, 1830, Cloyes' family resided at the Hutt place: no fence or improvement about the shop in May, 1830, and till Cloyes' death—Cloyes' family never lived there from that time. Mr. Badgett disproves the possession in 1830, and by inference, the cultivation in 1829, as there was no sign of improvement about it in 1830. .

" *John C. Heilman:* No family lived at the tin-shop in 1829 or 1830: Nathan Cloyes, according to his recollection, then in neighborhood of Fulton place: his impression that no improvement about the shop in 1829 and 1830: it stood vacant, and was occupied as a store-house would have been.

" *William Field:* In the spring of 1830, Cloyes and family lived at the Hutt place, to the best of his recollection: never saw or heard of any family in the tin-shop.

"The two preceding witnesses are not positive in their testimony: but that of Mr. Field, supports the negative of possession in 1830; and that of Heilman is stronger in disproof of both possession and cultivation.

" *Richard Fletcher:* Cloyes had a tin-shop in 1829 and 1830, between Judge Ringo's and the river, near the Quapaw line—was frequently at shop in those years: have no knowledge of his family being there then; and in those years, visited his family

at the Fulton and Hutt places: a very small enclosure about the tin-shop in 1825: do not recollect of any fence or cultivation about the building in 1829 and 1830.

"*Jacob Reider:* Came to Little Rock, 18th May, 1828: Cloyes had a tin-shop back of Judge Ringo's residence, nearly west of Quapaw line: no improvement or cultivation about the shop in 1829 and 1830—stood a naked house—nor did Cloyes' family live there.

"*Jacob Tutewiler:* Nathan Cloyes and family lived at Hutt place three or four years before he died—Cloyes' tin-shop, which he kept from about two years after the Quapaw line was run, [at which, witness assisted in carrying the chain and marking,] in 1826, till his death—there was no fence or cultivation about the house, it stood as a vacant house.

"*Samuel Floyd* says, he came to Little Rock, in May, 1829, became acquainted with Nathan Cloyes, among the first with whom he made acquaintance: he, with his family, lived on the bluff of the Arkansas river, below Little Rock, near the lower steam-boat landing, perhaps a little below the point of rock—lived in a cabin near his shop; but in what direction, cannot say positively—thinks rather below—well remembers the garden near the cabin, and cultivated—lived there in 1830.

"Of the last four witnesses, Floyd proves the cultivation and possession. Fletcher, Reider and Tutewiler disproves both: Fletcher and Floyd testifying with less certainty than the other two.

"*John M. Richardson:* In 1829 and 1830, Cloyes and family lived just below what was called the Quapaw line—not positive they lived there before or after—Cloyes had a tin-shop and house under the same roof, adjoining—does not recollect of any cultivation about the house, but a small piece of ground fenced in at south-west end of house. Richardson is a good witness for complainants to prove possession in 1830, if proveable by residence of Cloyes at the tin-shop, and good for defendants to prove no cultivation in 1829.

58c

" *Hardy Jones :* Thinks, in 1829 and 1830, Cloyes lived near the lower steam-boat landing—not positive—but so to the best of his recollection—his family lived in same cabins with the shop, and afterwards in another cabin lower down : but only at short distance—had a little garden near the house—cultivated. it—does not know that Cloyes and family lived there in 1829 and 1830—thinks they did, about that time.

*William H. Keltner :* Came to Little Rock 2d July, 1829—stopped in house below steam-boat landing, near the point of rock. Nathan Cloyes was carrying on tinning trade in shop across the road, about eighty feet from house I lived in—his family lived in a cabin one hundred yards, or more, back of the shop, rather quartering down the river from it—he had a garden down the river from the shop, adjoining it—cabbages, lettuce, mustard and onions growing in it—the cabbages very fine—saw Miss Cloyes frequently come from house to garden to get vegetables—stayed six days—did not come back to Little Rock till 1831.

" The last witness proves cultivation in 1829, of cabbages and vegetables : proves nothing about possession in 1830 : but Jones proves nothing, only that Cloyes, at some time, either in 1829 or 1830, or before, or after, lived near the shop.

" I have thus given an abstract of all the testimony before me upon the facts on which the validity of the pre-emption depends. I began the labor of examining the testimony, without any definite opinion of what would be the rusult of the examination. I admit myself much disappointed, that in the immense mass of evidence on file, I have not found more pertaining to the particular facts on which the search has been made for proof. Other depositions and parts of the depositions, above abstracted, may relate to other parts of the case, as understood by the parties, proper to be proven : but it still remains true, that much of the testimony derived from witnesses, so far as it has any perceivable connection with the case, was auxiliary to the production of proof of the conditions of occupancy and settlement.

"The result is, that the complainants have produced witnesses, who, in greater or less degree, have given testimony to the effect, that Nathan Cloyes had a garden near his shop, on the piece of land in controversy, in 1829, and that he was living on it, in a cabin adjacent, at the date of the passage of the act of 29th May, 1830.

"On the other hand, the defendants have shown, by witnesses exceeding in number, that Cloyes did not cultivate any ground on the piece of land in controversy, in 1829 : and he was not in possession of it on the 29th May, 1830 : unless the occupancy of the tin-shop, in carrying on his trade, be a possession under the act. These witnesses are, Robert A. Calloway, Matthew Cunningham, Asa G. Baker, Benjamin Clemens, Robert A. Watkins, Noah H. Badgett, John C. Heilman, William Field, Richard Fletcher, Jacob Tutewiler and John M. Richardson, as to the cultivation.

"Of these witnesses, it might be remarked of some, on each side, that they testify with indistinctness, as to the particular facts required to be made out, and that others show exact and perfect method and completeness in detail. Allowance is to be made for both classes of witnesses. We naturally expect witnesses, in giving in circumstantial accounts of events that happened twenty and thirty years back, in which they were not personally and vitally interested, to present imperfect, disjointed and confused statements, while of facts, that require no such particularity, their testimony is entirely satisfactory.

"And we also know, from observation, that there are men of such tenacity and minuteness of memory, that so long as they have its use, they can give as full, exact, and apparently, as correct accounts of remote facts, as if the impression had just been made on their senses. And some men, we see, testify so carelessly about dates and minute facts of detail, that no dependence can be put on their testimony, although it may not be subject to any severe remark.

"I see nothing in the testimony of these witnesses, from which I can draw less or more favorable conclusions than would be expected from the narration of incidents that happened twenty and more years before the statements: these incidents being evidently, at the time, unimportant to the narrators. Nor need I make any distinction, as a class, for, or against the witnesses examined on the part of either party. Both parties have strenuously insisted that their own witnesses, for reasons they have urged, were better entitled to credit, as to these circumstantial matters of locality, date and observation of improvement, than those of their adversaries, but I cannot say that those arguments have made much impression upon my mind from their foundation in sound philosophy: from my knowledge with human nature, or from any legal rules of application to the depositions on file.

"The defendants' witnesses are insisted to have the advantage of long acquaintance and entire familiarity with the subjects and characters about which they are called to depose: and that, from such premises, the conclusion is inevitable, that they can testify with more intelligence and probable correctness than the complainants' witnesses, who, as a class, have had a more limited knowledge of the place, and Cloyes and his family, and their general history. There might be force in the argument, if it was general history that was wanted in this case: but we can do as well without as with the connected narratives, we have had given, provided the proof of the particular facts and dates is afforded. I do not see why *Keltner*, who was here only six days, cannot as well tell where Cloyes was living as if he had continued here till this time. Nor on the other hand, can I appreciate the force, or perceive the reasonableness of that conclusion which would hold that *Jacob Reider*, because he was often at the tin-shop, and because it was his daily walk, was thereby less able to disclose, with certainty, whether Cloyes was making a garden, a crop, or improvements of any kind any given season. He, certainly had

the advantage of the .vividness of his first impression, as well as the specimen of the other class.

"I come to this conclusion, and am entirely satisfied with its propriety, and that there is no reason why I should not weigh this testimony as that of witnesses of equal intelligence and credibility.

"Doubtless, this case has a different aspect, on both sides, than it would have presented if it could have been sustained by the testimony of others, who were living and acting in the scenes which have been shadowed before us; or, if it could have rested on the statements of the witnesses, whose recollection of the facts is contained in these depositions, when their memories were fresh, and their impressions of the events then recent, could have been spread out into testimony. But time has its mouldering, decaying effect upon all. Both parties are alike affected by its ravages upon the lives and memories of men. And evidence of this sort must operate equally upon parties litigant. It is not philosophical to claim allowance against opposing testimony for its imperfections, on this score, and exemption from the application of the principle.

"Tried by this test, the complainants cannot maintain their suit. The number of the witnesses, the consequent intelligence, credibility and influence of the defendants' testimony overbear that on which the bill rests, and it must fall.

"I have chosen to consider this branch of the case, as if the cultivation, of which the witnesses have spoken, was an actual *bona fide* occupancy, under the pre-emption act. But if severely tried by the authoritative construction of the law—if fairly reduced to a fulfilment of its requisitions—I cannot but think this claim would be out of its range, especially when the situation of the land sought to be recovered is known.

"If it be within the letter of the law to subject this fractional quarter section to its operation, it seems to me it cannot be according to its spirit to make such donation to one, who never expended labor, time or money upon it: who had no character-

istics of that class of persons, for whose recompense pre-emption privileges have been reserved. And if an earnest attempt had been made to have reconciled the conflicting testimony, that of the complainants', I think, might have been reduced from the strength given it: for, I cannot but think that the result would be, that some, which I have allowed, towards proof of the occupancy in 1829, of the vicinity of the point of rock, would fall back upon the Hutt lots, which the complainants admit to be his residence before and after 1829, and the defendants assert was during the whole of that year. In every possible way that I can view the testimony, I seem, to myself, to have given it its full, its greatest efficacy."

We might well enough conclude here, but as the counsel for the complainants seems to make the point, upon the testimony, that the house, which Mrs. Chandler occupied in 1832 and 1833, according to the testimony of Greer and Pope, may have been the same that the family of Cloyes occupied in 1829 and 1830, and thus locate the supposed cultivation thereabout, it may be proper to respond to that position by a reference to the deposition of one of the complainants' own witnesses, Burk Johnson, who says: "There was no person living below the Quapaw line, or point of rocks, but Cloyes and his family, until 1831 or 1832, for a distance of a mile or two, the whole space being covered with bushes and timber, except Cloyes' settlement. I rented the house below the Quapaw line, formerly occupied by Cloyes and family, and took possession on the 6th of November, 1831. I rented it of Emzy Wilson, as agent of Cloyes' widow, and kept the possession until April, 1833, when I paid the rent and moved to Yell county." Thus, according to the complainants' own showing, that theory cannot be maintained, and it is inferential that the log-house, that Mrs. Chandler occupied during the years 1832 and 1833, was built by some one after 1830.

Upon the whole testimony, we come to the conclusion, that the alleged pre-emption right in question, was but colorable, and was not substantial, and was fraudulent in law, and found in favor of

Cloyes, by the Register and Receiver at Batesville, upon false testimony. We shall, therefore, affirm the decree of the Chancellor, dismissing the complainants' bill.

Mr. Justice HANLY: I concur in the *result* of the opinion just delivered; but as there are some positions taken in the opinion, which I do not sanction, as well as reasoning, which I do not subscribe to — not bearing, however, upon the main point upon which the cause is made to hinge — I desire, without attempting to give my views, *in extenso*, upon the subject, to designate the ground upon which I place my concurrence.

I am of opinion, that the question in reference to the fraudulent character of the pre-emption claim of Cloyes to the fraction of land in controversy, was one impliedly left open by the Supreme Court of the United States, when this cause was adjudicated by that court, at their January term, 1850, as manifested by the report thereof in 9 *How. U. S. Rep.* 314, *et seq.*

I am further of opinion, that the testimony, shown by the record, renders it manifest that the claim of Cloyes, to a pre-emption upon the fraction of land in question, was established before the Register and Receiver of the Land Office at Batesville, on the 28th May, 1831, by means of perjury perpetrated by the claimant, and that the allowance and approval of the claim by those officers, as shown by the record at bar, was obtained by the fraud of Cloyes, through the instrumentality of that perjury.

And I am further of the opinion, that the fraudulent character of the pre-emption claim of Cloyes being established, as I conceive it to be, a Court of Chancery could not, upon principle, give the complainants, claiming under that fraudulent pre-emption right, any relief whatever against any of the defendants, though they claim under a patent, issued subsequently to the establishment of the pre-emption of Cloyes to the satisfaction of the Register and Receiver at Batesville. See *Wynn vs. Morris et al.*, 16 *Ark. Rep.* 414; *Wynn vs. Garland, same* 440.

These propositions, and my conclusions upon them, enable me to agree to the result announced in the opinion just delivered. I decline to give any expression upon the other points considered and discussed, further than as hereinbefore intimated, preferring to reserve those questions for a future occasion, when, from the nature of the case, they will necessarily require special notice and direct application.